Commonwealth *vs.* Scott D. Kirwan.

Plymouth. December 7, 2006. - February 2, 2007.

Present: Marshall, C.J., Greaney, Ireland, Spina, & Sosman, JJ.

*Homicide. Practice, Criminal,* Capital case, Admissions and confessions, Voluntariness of statement, Assistance of counsel, Cross-examination by prosecutor, Argument by counsel, Argument by prosecutor, Instructions to jury. *Evidence,* Admissions and confessions, Voluntariness of statement, Consciousness of guilt. *Constitutional Law,* Admissions and confessions, Assistance of counsel. *Due Process of Law,* Assistance of counsel.

At the trial of an indictment charging murder in the first degree, the judge did not err in denying the defendant's motion for a required finding of not guilty, where the evidence was sufficient to warrant a finding that the defendant acted after the reflection necessary to establish deliberate premeditation. [308]

A police officer's failure to advise a criminal defendant of his Miranda rights prior to questioning did not require suppression at trial of the defendant's responses, where the defendant failed to demonstrate that the investigatory questioning, which was conducted in a nonaggressive manner by a single police officer in the defendant's home, occurred in a custodial environment. [308-313]

The defendant at the trial of an indictment charging murder in the first degree failed to demonstrate either an abuse of discretion or other error of law, or ineffective assistance of counsel, arising out of the prosecutor's allegedly improper offer of evidence of the defendant's prearrest silence [314-315]; the prosecutor's reference at trial to prison movies [315]; defense counsel's closing argument [315-316]; the prosecutor's reference, in closing argument, to a statement attributed to the defendant that was fairly inferable from the evidence [316-317]; the judge's failure to give a "humane practice" instruction, where voluntariness was not a live issue at trial [317-318]; or the judge's failure to give a jury nullification instruction that the defendant was not entitled to receive [318-319]; further, as there was no error, there could not be any substantial likelihood of a miscarriage of justice flowing from any alleged cumulative error as described in the defendant's motion for a new trial, and the motion properly was denied [319].

Indictment found and returned in the Superior Court Department on August 9, 1999.

Pretrial motions to suppress evidence were heard by *Raymond*

*J. Brassard*, J.; the case was tried before *Richard J. Chin*, J., and a motion for a new trial, filed on July 27, 2005, was heard by him.

*Stephen Paul Maidman* for the defendant.

*Carolyn A. Burbine*, Assistant District Attorney, for the Commonwealth.

SPINA, J. The defendant was convicted of murder in the first degree, on a theory of deliberate premeditation. On appeal he alleges error in (1) the denial of his motion for a required finding of not guilty at the close of the Commonwealth's case, and (2) the denial of the motion to suppress his statement made to police without prior Miranda warnings. The defendant also appeals from the denial of his motion for a new trial in which he alleges (1) error in two evidentiary rulings and related claims of ineffective assistance of counsel based on failure to request curative instructions; (2) ineffective assistance of counsel based on inadequate argument concerning mitigation; (3) prosecutorial misconduct for arguing a critical fact not in evidence, and a related claim of ineffective assistance of counsel for failure to object; (4) error in failing to instruct the jury on "humane practice" and jury discretion in determining the degree of murder, and related claims of ineffective assistance of counsel based on failure to request such instructions; and (5) entitlement to a new trial based on the cumulative effect of all the errors alleged in his motion for a new trial. Finally, the defendant asks us to exercise our power under G. L. c. 278, § 33E, and grant him a new trial or reduce the degree of his conviction, as justice requires. We affirm the judgment and the denial of the defendant's motion for a new trial. We decline to exercise our power under G. L. c. 278, § 33E.

1. *Facts.* For purposes of the defendant's motion for a required finding of not guilty, the jury could have found the following facts. *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979).

In July, 1999, the defendant lived with his father in Pembroke, in an apartment owned by his father. Brian Perry, a good friend of the defendant, rented an apartment in the same building from the defendant's father. On Friday, July 2, 1999, at about 11 P.M., the defendant and Perry walked to a bar ap-

proximately one hundred feet across the street from their apartment building. The bar was crowded, so they stood next to the juke box, drinking and talking to friends.

The defendant had several brief encounters that night with the victim. The first encounter, essentially the continuation of an argument they had a few weeks earlier, ended when Perry told them to "grow up" and "shake hands." During the second encounter, the defendant, who appeared angry, said to the victim that they could "take it outside." The victim walked away.

Shortly before midnight, the defendant left the bar for about fifteen minutes, ostensibly to record a movie that was scheduled to be shown on television at midnight. He also mentioned to Perry that he wanted to get a "shank" (a knife) because he was worried about two men sitting with a former girl friend of the defendant. The men were glaring and snickering at the defendant, and one of them repeatedly walked past the defendant and nudged him. After he returned to the bar, the defendant paced around, appearing nervous and agitated. The two men with the defendant's former girl friend had left the bar and no longer were a concern to him. However, the victim approached the defendant and they had words a third time. Five minutes later the defendant told Perry that he was worried about the victim and a man who was with him.

The victim and his friend left the bar before the last call was announced at 12:30 A.M. As they were leaving, the victim and the defendant again had words. The defendant told Perry that he was worried he was going to have to fight them. Perry tried to keep the defendant inside the bar by ordering another beer and encouraging him to stay. The victim returned to the bar about ten minutes later and again argued with the defendant. After the victim left, the defendant urged Perry to leave, but Perry did not give in. The defendant and Perry left the bar at approximately 1 A.M.

When they reached the street, the victim drove his truck alongside the defendant. They began to argue. The defendant told the victim to get out of his truck. He waited while the victim parked the truck. The two men approached each other in the middle of the street. At the time, the defendant, who was five feet, nine inches tall, and weighed about 230 pounds, said

to the victim, who was five feet, eight inches tall, and weighed about 180 pounds, "I'm from Malden, I'll kill you." He then punched the victim in the chin with his right fist. The victim did not strike back. He tried to deflect the blow and said he did not want to fight. The defendant threw a second punch, striking the side of the victim's chest with his right fist. The victim tried to fend off the punch and backed away. The defendant then put his right hand behind his back and gestured with his left hand. He delivered a third punch, striking the victim with a hard right to the front of the chest. He had a shiny, metallic object in his hand. The defendant then shouted that he was going to get his nine millimeter gun and walked about fifty feet to his home.

The victim turned and walked toward his truck. After walking about thirty feet, he fell flat on his face without trying to break the fall. He was bleeding and unconscious; his eyes were rolled back in his head, and his breathing was irregular. He had a puncture wound near his sternum. Police and an ambulance arrived within a short time. The victim was taken to a hospital, where he died. The cause of death was a loss of blood due to a knife wound to the chest. The blade of the knife (found later that night), two inches long, was thrust with substantial force three inches into the victim's body. It passed through the fifth right rib before perforating the right ventricle of the heart.

Based on witness interviews at the scene of the incident, Detective David Hurley of the Pembroke police department and two other officers went to the defendant's apartment. The defendant's father let Hurley inside. The defendant, who was also inside, matched the description given by witnesses as the person who fought with the victim. Hurley asked the defendant if he would tell him about the fight that had just occurred. The defendant said that a kid pushed him and he pushed the kid back. The defendant paused, shrugged his shoulders, then looked down. Hurley asked the defendant "how the kid got a hole in his chest," but the defendant did not respond.[1] On arriving home minutes earlier, the defendant had told his father that he

---

[1] This was contrary to Detective David Hurley's testimony at the hearing on the motion to suppress evidence. There, he testified that the defendant said he knew nothing about the knife wound. This is discussed further in parts 3 and 4(a), *infra.*

was jumped in the parking lot of the bar and that someone tried to hit him with a beer bottle.

A search of the apartment, for which the defendant's father gave consent, produced no weapon. The defendant was placed under arrest for assault and battery by means of a dangerous weapon. The scene itself was then searched and a small knife with blood on it was found in the street. The knife was consistent with the victim's wound, and deoxyribonucleic acid (DNA) testing performed on the blood on the knife, as well as on blood found on the street, matched the victim's DNA.

None of the witnesses had seen the victim push, punch, or strike the defendant at any time, and the victim did not have a weapon.

2. *Motion for a required finding of not guilty.* The defendant argues that the trial judge erred by denying his motion for a required finding of not guilty as to the issue of premeditation. In particular, he contends that the dispute between him and the victim inside the bar earlier that night had ended and there was no evidence of premeditation.

There was sufficient evidence from which a jury could find premeditation. See *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979). The defendant announced in the street that he was going to kill the victim. The jury could have inferred that the defendant procured the knife and concealed it for the purpose of killing the victim. See *Commonwealth* v. *Shelley*, 374 Mass. 466, 474 (1978), *S.C.*, 381 Mass. 340 (1980). The jury also could have inferred that the defendant lulled the victim into believing he was only involved in a fist fight by throwing two bare-fisted punches to his face and side, and then distracted the victim by waving his left hand in order to have a clear thrust at the victim's heart with the knife concealed in his right hand. The evidence is sufficient to warrant a finding that the defendant acted after the reflection necessary to establish deliberate premeditation. *Commonwealth* v. *McAfee*, 430 Mass. 483, 494-495 (1999), quoting *Commonwealth* v. *Chipman*, 418 Mass. 262, 269 (1994). There was no error.

3. *Motion to suppress statement.* The defendant asserts error in the denial of his motion to suppress the statement he made in his home to Hurley. He argues that Hurley's failure to advise

him of his Miranda rights before asking him questions designed to elicit an incriminating response, which he contends is custodial interrogation, violated his rights under the Fifth and Fourteenth Amendments to the United States Constitution, and art. 12 of the Massachusetts Declaration of Rights.

"Miranda warnings are only necessary for 'custodial interrogations.' " *Commonwealth* v. *Jung*, 420 Mass. 675, 688 (1995), quoting *Miranda* v. *Arizona*, 384 U.S. 436, 444 (1966) (*Miranda*). Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* "[T]he safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.' " *Berkemer* v. *McCarty*, 468 U.S. 420, 440 (1984), quoting *California* v. *Beheler*, 463 U.S. 1121, 1125 (1983). The defendant has the burden of proving that interrogation was custodial. *Commonwealth* v. *Larkin*, 429 Mass. 426, 432 (1999). The test is an objective one: would a reasonable person in the circumstances of the defendant's interrogation have perceived the environment as coercive? See *Stansbury* v. *California*, 511 U.S. 318, 323-325 (1994).

The factors relevant to determining whether a suspect is in custody for Miranda purposes include "(1) the place of interrogation; (2) whether the officers have conveyed to the person being questioned any belief or opinion that that person is a suspect; (3) the nature of the interrogation, including whether the interview was aggressive or, instead, informal and influenced in its contours by the person being interviewed; and (4) whether, at the time the incriminating statement was made, the person was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave, as evidenced by whether the interview terminated with an arrest." *Commonwealth* v. *Groome*, 435 Mass. 201, 211-212 (2001). Rarely will any single factor be determinative. *Commonwealth* v. *Bryant*, 390 Mass. 729, 737 (1984). When reviewing a motion judge's decision, substantial deference is given to the judge's findings of fact and conclusions of law, but we exercise our independent judgment as to the application of constitutional

principles to the facts found. *Commonwealth* v. *Conkey*, 430 Mass. 139, 144 (1999), *S.C.*, 443 Mass. 60 (2004).

The motion judge, who was not the trial judge, found the following facts. The defendant's father invited Hurley into the house, and Hurley did nothing to indicate to the father that he had no choice. Hurley was the only police officer in the house during the questioning of the defendant, which was very brief and proceeded in an investigatory, nonaggressive, and nonaccusatory manner. The questioning took place in the hallway, in the presence of the defendant's father.

Hurley first asked the defendant to tell him about the fight outside the bar. The defendant said that he had been pushed, and he pushed back. The defendant added, "That's when . . . ," and stopped. Hurley asked, "[T]hat's when what?" The defendant remained silent. Hurley asked how the victim got the wound to his chest, and the defendant said that he knew nothing about it. Hurley then reminded the defendant that he just said he had been in a fight. Hurley added that the defendant was the only person who had contact with the victim and that the victim had a stab wound in his chest, and then asked, "[Y]ou don't know how it got there?" The defendant put his head down and did not respond. The interview ended and Hurley asked the defendant to sit in the living room. The other two officers had entered the house by that time and stayed with the defendant in the living room while Hurley spoke to the defendant's father. The father gave Hurley permission to search the house. At the conclusion of the search, the defendant was placed under arrest for assault and battery by means of a dangerous weapon.

The motion judge found that Hurley was polite and courteous to the defendant. No threats had been made, and there was no show of force, either by drawing weapons, surrounding the defendant with several officers (Hurley was alone at the time), or blocking off any means of egress. Hurley did not tell the defendant that he was a suspect, and he did not tell him that the victim's wound was life-threatening.

The motion judge applied the factors for determining custody in the context of *Miranda. Commonwealth* v. *Groome, supra.* He noted that the defendant was interrogated in his home, in the presence of his father, by only one police officer who did not

physically block off the means of egress. Contrast *Commonwealth* v. *Coleman*, 49 Mass. App. Ct. 150, 154 (2000) (in-home interrogation made oppressive by three police officers, two of whom blocked closed door while one questioned suspect in small bedroom). The motion judge concluded, and we agree, that the place of interrogation was not coercive.

The motion judge also determined that the interrogation was not aggressive. He found it brief, polite, and courteous. Contrast *Commonwealth* v. *Coleman*, *supra* at 155 (questioning was "aggressive and persistent," suspect's denials were "scorned and overridden," and substance of conversation was harsh and of type normally associated with arrest and custody). Hurley had not communicated his suspicions to the defendant, either directly (by telling him he was a suspect, or that he thought he was guilty) or indirectly. *Stansbury* v. *California*, 511 U.S. 318, 324 (1994). The motion judge concluded that Hurley's questioning was generally of a fact-finding nature, intended to verify or dispel a reasonable suspicion of criminal activity, for which Miranda warnings are not required. See *Berkemer* v. *McCarty*, 468 U.S. 420, 439-440 (1984); *Commonwealth* v. *Cameron*, 44 Mass. App. Ct. 912, 914 (1998). He found the questioning investigatory rather than accusatory. This ruling was correct. Significantly, the motion judge found that none of the witnesses previously interviewed had seen the victim being stabbed. Although Hurley had been told by witnesses that the only participants in the fight were the defendant and the victim, he knew little more. He knew that the victim had a hole in his chest that appeared to be a stab wound, and that the defendant was the last person who touched him before he collapsed, but he had virtually no information as to the cause of the victim's wound. The questions put to the defendant were merely directed to whether the defendant knew what happened.

The motion judge found that although Hurley's last question tended to be "more focused and aggressive," it remained in balance, a continuation of a brief, preliminary effort to confirm or dispel a suspicion. The judge noted that Hurley's acquiescence in the defendant's decision not to respond to the last question was further evidence of the noncoercive environment. There was no error. The motion judge had the opportunity to see Hur-

ley testify and could assess the impact of his persona on a reasonable person. In any event, even if the last portion of the statement should have been suppressed, the jury did not hear it,[2] so there was no harm.

With regard to the final factor, whether the defendant was free to end the interrogation, the motion judge concluded that a reasonable person would not have felt free to end the interrogation or leave the hallway. He also found, however, that the psychological forces at play were not extreme. Contrast *Commonwealth* v. *Coleman, supra* at 152 (defendant told if he persisted in denials he would be arrested, handcuffed, and removed in presence of aunt; but if he confessed he would be summonsed to court). The judge observed that, although the defendant was not free to leave, Hurley's interrogation was brief and in the nature of a preliminary investigation, and the defendant's detention was minimal and similar to a *Terry*-type stop, see *Terry* v. *Ohio*, 392 U.S. 1 (1968), which does not rise to the level of a deprivation of freedom associated with formal arrest. *Berkemer* v. *McCarty, supra* at 439-440. He found Hurley's questions were "natural and preliminary and designed to determine what, if anything, the defendant knew." See *Commonwealth* v. *Shine*, 398 Mass. 641, 649 (1986).

The motion judge then considered these factors together and concluded that the interrogation of the defendant was not custodial. He found that the circumstances did not demonstrate an environment so dominated by the police that a reasonable person would perceive that his liberty was restrained to a degree associated with a formal arrest. Finally, he determined that the interrogation did not involve a "seizure of a sort that exerts upon a person 'pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights,' " quoting *Berkemer* v. *McCarty, supra* at 437. The record supports the motion judge's findings and conclusions, and we are satisfied that the interrogation of the defendant was not custodial.

The defendant relies on two cases for the proposition that

---

[2]The record indicates that the last portion of the defendant's statement was not introduced in evidence due to a memory lapse by Hurley. See part 1, *supra*, and part 4(a), *infra*.

questions designed to elicit an incriminating response create a custodial environment for Miranda purposes. However, the cases do not stand for such a principle. In *Commonwealth* v. *Gordon,* 47 Mass. App. Ct. 825, 828 (1997), the question was not, as here, whether the defendant was in custody at the time of interrogation, but whether the questions put to the defendant, who was in custody (she had been handcuffed), constituted interrogation. The questions put to the defendant in that case, which were designed to elicit an incriminating response, were held to be interrogation that should have been preceded by Miranda warnings. See *Commonwealth* v. *Torres,* 424 Mass. 792, 797 (1997). In the case at bar, there is no question that the defendant was subjected to interrogation. The issue in the present case, unlike the *Gordon* case, is whether the defendant was in custody. In addition, here the motion judge found that the questioning was merely a preliminary effort to confirm or dispel a suspicion. The possibility that an incriminating response might be forthcoming does not necessarily elevate the nature of questioning to a custodial level. A similar analysis applies to the second case on which the defendant relies, *United States* v. *Scott,* 270 F.3d 30, 43 & n.8 (1st Cir. 2001), cert. denied, 535 U.S. 1007 (2002).

The defendant also contends that because Hurley had probable cause to arrest the defendant, his questions were not of the type that would justify a brief detention to inquire and confirm or dispel suspicions of criminal activity. See *Berkemer* v. *McCarty, supra* at 440. The difficulty with this argument is that it is undermined by the motion judge's findings, as well as the law on the subject. Hurley had not communicated his suspicions to the defendant, and the objective circumstances of the interrogation do not disclose that there was a " 'restraint on [the defendant's] freedom of movement' of the degree associated with a formal arrest," *California* v. *Beheler,* 463 U.S. 1121, 1125 (1983), quoting *Oregon* v. *Mathiason,* 429 U.S. 492, 495 (1977), so as to place the defendant in custody. There was no error.

4. *Motion for a new trial.* The defendant raises several claims of unpreserved error in his motion for a new trial, each of which is accompanied by a related claim of ineffective as-

sistance of counsel. He also raises a claim of ineffective assistance in its own right. We review the judge's denial of a motion for a new trial to determine whether there has been an abuse of discretion or other error of law. We give special deference to the decision of a judge who, as here, was also the trial judge. *Commonwealth* v. *Murphy*, 442 Mass. 485, 499 (2004), citing *Commonwealth* v. *Grace*, 397 Mass. 303, 307 (1986). We now address his claims.

a. *Evidence of prearrest silence.* The defendant contends that it was error for the trial judge to admit evidence of the defendant's prearrest silence, that is, his failure to respond to Hurley's question about how the victim received the hole in his chest. There was no objection, so the question is whether any error created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Thompson*, 431 Mass. 108, 117, cert. denied, 531 U.S. 864 (2000).

The defendant suggests that the evidence was offered impermissibly as consciousness of guilt and that it denied him his privilege against self-incrimination. However, it is apparent from the record, and the trial judge found in his decision on the motion for a new trial, that the prosecutor was not offering evidence of the defendant's prearrest silence, but expected Hurley to testify that, in response to his question "how the victim got a hole in his chest," the defendant responded, "I don't know." That is in fact how Hurley had testified before the grand jury and how he testified at the hearing on the motion to suppress. At trial, Hurley appears to have suffered a memory lapse. The prosecutor tried to rectify the situation, but he was prevented from doing so by the judge in response to a defense objection. The prosecutor avoided the problem in his closing argument, and he did not seek a consciousness of guilt instruction.

As the judge noted, the resulting state of the evidence did not harm the defendant, because the defendant never suggested that he did not stab the victim. The defense was self-defense and mitigation. Moreover, by successfully objecting to the prosecutor's attempt to rectify Hurley's memory lapse, defense counsel was able to exclude the defendant's actual answer to the question, which in fact was a lie. Finally, the prosecutor never commented on the defendant's exercise of his right to remain silent.

To the extent there was error, it was error that hurt the Commonwealth, not the defendant. The prosecutor should have been given the opportunity to rectify the problem attributable to Hurley's memory lapse. The error was, in a sense, invited, see *Commonwealth* v. *Knight*, 37 Mass. App. Ct. 92, 100 n.2 (1994); rather than creating a substantial likelihood of a miscarriage of justice, it benefited the defendant.

Because there was no substantial likelihood of a miscarriage of justice, there could have been no ineffective assistance of counsel for failing to request a curative instruction. *Commonwealth* v. *Maynard*, 436 Mass. 558, 572-573 (2002).

b. *Reference to prison movies.* When Perry testified that he did not know what a "shank" was, the prosecutor asked if he had ever seen a prison movie. Counsel's objection was sustained. The defendant now argues that the prosecutor's question left the jury with the impression that he was a seasoned criminal, and that the judge, sua sponte, should have given a curative instruction. We disagree.

The judge, who had the opportunity to see this as it unfolded during the trial, found that it did not create the impression the defendant claims, but "at most implied that the term 'shank' was a term commonly used in prison movies." The judge could make use of his knowledge of what occurred at trial when deciding the motion for a new trial. *Commonwealth* v. *DeChristoforo*, 360 Mass. 531, 543 (1971). Questions going to the weight of the evidence rest in the judge's discretion. *Id.* Moreover, in his final instructions, the judge told the jury that a question put to a witness is not evidence, and the jury were presumed to follow the instruction. *Commonwealth* v. *Johnson*, 441 Mass. 1, 7 (2004). There was no error.

Because there was no error, there was no ineffective assistance of counsel for failure to request a curative instruction, as presented in the related claim. *Commonwealth* v. *Dykens*, 438 Mass. 827, 837 (2003).

c. *Counsel's closing argument.* There is no merit to the defendant's claim that his attorney "failed to properly marshal the arguments excusing and mitigating the crime of murder" in his closing argument, thereby depriving the defendant of the effective assistance of counsel. The defendant contends that

counsel "completely abandoned his manslaughter theory" by failing to ask the jury to return a verdict of manslaughter, and he "effectively denuded the [d]efendant of available defenses to the crime" by failing to concede explicitly that the defendant stabbed the victim. As to the latter point, the defendant explains that failing to concede the stabbing distracted the jury, who must have felt counsel was "somehow in denial over who stabbed [the victim]." See *Commonwealth* v. *Street*, 388 Mass. 281 (1983).

The defendant proceeded on theories of self-defense, excessive force in self-defense, reasonable provocation, and mutual combat. "Inherent in the defendant's argument [at trial] that he was not guilty because he had acted in self-defense was his reliance on provocation[, mutual combat, and excessive force in self-defense] to mitigate the charge of murder to manslaughter, if the self defense claim were to fail." *Commonwealth* v. *Boucher*, 403 Mass. 659, 663 (1989). Indeed, if counsel had asked the jury to return a manslaughter verdict in the manner now urged on appeal, he would be faulted for abandoning the defense of self-defense.

The judge succinctly disposed of the claim that counsel expressly should have conceded the stabbing by noting that there is no need to state the obvious. He found that implicit throughout the trial, and indeed the theme of counsel's closing argument, "was that the defendant was provoked and was protecting himself from an aggressive individual who was seeking revenge against the defendant." The judge highlighted the vivid manner in which counsel described the victim's persistently aggressive behavior toward the defendant the entire evening, and how counsel artfully contrasted this against the defendant's increasingly fearful state of mind as the evening progressed. He characterized counsel's argument as "forceful," and noted that he "argued all of the available facts supporting self defense and mitigation." We are satisfied that counsel's closing argument did not deprive the defendant of effective assistance of counsel. See *Commonwealth* v. *Wright*, 411 Mass. 678, 681-682 (1992).

d. *Prosecutor's closing argument.* Contrary to the defendant's assertion, the prosecutor's argument that the defendant

said he was going home to get a "shank" was supported by the evidence. Although Perry never testified precisely that the defendant told him he was going home to get a shank, the evidence permitted an inference that the defendant expressed an intention to go home, in part, to get a shank. See *Commonwealth* v. *Duguay*, 430 Mass. 397, 404 (1999), quoting *Commonwealth* v. *Chavis*, 415 Mass. 703, 713 (1993). The prosecutor's inference was based on the following excerpt from Perry's direct testimony:

*Q.*    "Tell us exactly what [the defendant] said . . . ."

*A.*    "I couldn't exactly tell you what he said. He just said something about a shank. He was worried about the two guys on the other side, and he was worried about wanting to pick up a shank or something like that."

*Q.*    "So, he said he was going home?"

*A.*    "He was going home for the taping, yes."

*Q.*    "Said he was going to get a shank?"

*A.*    "He just said something about a shank."

In his decision on the defendant's motion for a new trial, the judge observed that, even if the prosecutor had misquoted Perry as to what the defendant had said, "the statement attributed to the defendant was fairly inferable from the evidence." The argument was not improper. Cf. *Commonwealth* v. *Cosme*, 410 Mass. 746, 755 (1991) (minor misstatements or mischaracterizations in argument do not warrant reversal). We add that the jury were instructed that it was their memory of the testimony that was controlling, not that of the attorneys or even the judge.

Because there was no misconduct on the part of the prosecutor, there was no ineffective assistance of counsel for failure to object. *Commonwealth* v. *Wright, supra.*

e. *"Humane practice" instruction.* The defendant contends that the judge erred by failing to instruct the jury that they had to find the defendant's statement to Hurley was made voluntar-

ily before they could consider it, under our "humane practice" rule. *Commonwealth* v. *Tavares*, 385 Mass. 140, 150, cert. denied, 457 U.S. 1137 (1982). If voluntariness is a live issue at trial, that is, if substantial evidence of involuntariness is produced, a judge must conduct a voir dire on the question, sua sponte. If the judge concludes the statement is voluntary, the issue of voluntariness must be submitted to the jury.[3] *Commonwealth* v. *Sheriff*, 425 Mass. 186, 193 (1997). If voluntariness is not a live issue at trial, the judge need not submit the question to the jury. *Commonwealth* v. *Tavares*, *supra*, quoting *Commonwealth* v. *Alicea*, 376 Mass. 506, 523 (1978).

Here, the defendant claims that voluntariness was a live issue at trial because of his intoxication. Although the evidence indicated the defendant had consumed a number of beers, evidence of a defendant's consumption of alcohol does not in itself trigger an obligation to inquire into the voluntariness of any statement he made, or to instruct the jury on the voluntariness of such statement. See *Commonwealth* v. *Brady*, 380 Mass. 44, 49 (1980). There was no evidence that the defendant was intoxicated. Rather, the evidence suggested that he was not intoxicated. Noting the substantial evidence that the defendant was not intoxicated when he made his statement to Hurley, the judge ruled that voluntariness was not a live issue at trial and the instruction was not required. The ruling was correct.

Because voluntariness was not a live issue at trial, the defendant's claim that he was denied effective assistance of counsel based on his attorney's failure to request a voluntariness instruction necessarily fails. See *Commonwealth* v. *DeMarco*, 444 Mass. 678, 685 (2005).

f. *Murder instruction.* The defendant argues that it was error to fail to instruct the jury, conformably with the Model Jury Instructions on Homicide 19 (1999), which state: "The law requires me to tell you that if the evidence allows you to find the defendant guilty of murder in the first degree, you may return a verdict of guilty of murder in the second degree."

The quoted instruction is from the instructions on felony-

---

[3] If the judge concludes that the statement is not voluntary, it must be excluded. *Commonwealth* v. *Tavares*, 385 Mass. 140. 149, cert. denied, 457 U.S. 1137 (1982).

murder, which has no application to this case. Moreover, we recently decided to abandon that instruction as anachronistic, see *Commonwealth* v. *Paulding*, 438 Mass. 1, 10 (2002), and we have consistently declined to recognize jury nullification instructions such as this in other contexts since well before the trial in this case. See, e.g., *Commonwealth* v. *Leno*, 415 Mass. 835, 842 (1993); *Commonwealth* v. *Fernette*, 398 Mass. 658, 670-671 (1986); *Commonwealth* v. *Hebert*, 379 Mass. 752, 755 (1980). Jury nullification is inconsistent with a jury's duty to return a guilty verdict of the highest crime proved beyond a reasonable doubt. *Commonwealth* v. *Paulding, supra* at 9. There was no error, and counsel was not ineffective for failing to request an instruction the defendant was not entitled to receive. *Commonwealth* v. *DeMarco, supra.*

(g) *Cumulative error.* As there was no error, except the invited error in the admission of the defendant's prearrest silence (which benefited the defendant), there could not be any substantial likelihood of a miscarriage of justice flowing from the allegations of unpreserved cumulative error as described in the defendant's motion for a new trial, and the motion properly was denied.

5. *Relief under G. L. c. 278, § 33E.* We have reviewed the briefs, the transcripts, and the record in this matter, and we conclude there is no reason to reduce the degree of the conviction or order a new trial.

*Judgment affirmed.*

*Order denying motion for new trial affirmed.*