# United States Court of Appeals
## For the First Circuit

No. 09-2438

SCOTT D. KIRWAN,

Petitioner, Appellant,

v.

LUIS SPENCER, SUPERINTENDENT,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Torruella and Lipez, Circuit Judges,
and Smith,[*] District Judge.

Stephen Paul Maidman, for appellant.
Argie K. Shapiro, Assistant Attorney General, Criminal Bureau,
with whom Martha Coakley, Attorney General, was on brief for
appellee.

January 28, 2011

---

[*] Of the District of Rhode Island, sitting by designation.

**TORRUELLA**, **Circuit Judge**. After a jury trial in the Massachusetts Superior Court, Scott D. Kirwan was convicted of first-degree murder and sentenced to life in prison for killing Steven Meagher. Kirwan appealed, and the Massachusetts Supreme Judicial Court ("SJC") affirmed his conviction. See Commonwealth v. Kirwan, 860 N.E.2d 931, 943 (Mass. 2007).

Kirwan filed a petition for a writ of habeas corpus in the federal district court, which the court denied, adopting without further explanation the magistrate judge's report and recommendation. See Kirwan v. Spencer, No. 08-10651, slip op. at 68 (D. Mass. Aug. 25, 2009). Kirwan then applied for a certificate of appealability ("COA") as to the denial of the writ. The district court granted the COA as to two of the grounds in Kirwan's petition. Thus, the following issues are on appeal: (1) whether certain remarks by the prosecutor during closing argument deprived Kirwan of his rights to a fair trial and due process, and (2) whether trial counsel's failure to object to, and seek curative instructions following, the prosecutor's allegedly improper remarks deprived Kirwan of his right to effective assistance of counsel.

## I.  Background

**A.  The Night of Meagher's Death[1]**

On July 2, 1999, at approximately 11:00 p.m., Kirwan and his friend Brian Perry walked from the apartment building in which they both lived to a crowded bar across the street.  There, Kirwan had several brief encounters with Meagher.  The first, essentially a continuation of an earlier argument, ended when Perry told Kirwan and Meagher to "grow up" and "shake hands."  During the second, an angry Kirwan told Meagher that they could "take it outside," but Meagher walked away.  Between the second and third encounters, Kirwan left the bar for approximately fifteen minutes, ostensibly to record a pay-per-view movie that was scheduled to be televised at midnight.  Before Kirwan left the bar to record the movie, he spoke with Perry.  As discussed below, Kirwan mentioned "something about a shank" to Perry.  When Kirwan returned, Meagher was still at the bar.  During their third encounter, Meagher approached Kirwan and they argued.  Shortly thereafter, Kirwan told Perry that he was worried about Meagher and another man, Leo Purcell, who was with Meagher.  As Meagher left the bar, he and Kirwan again

---

[1]  We present most of the facts as the SJC summarized them in <u>Kirwan</u>, 860 N.E.2d at 934-36.  <u>See</u> 28 U.S.C. § 2254(e)(1) (state court factual determinations presumed to be correct in federal habeas proceedings); <u>see also</u> <u>Evans</u> v. <u>Thompson</u>, 518 F.3d 1, 3 (1st Cir. 2008).  Where, however, the parties dispute whether a certain determination is subject to section 2254(e)(1)'s presumption of correctness, we have omitted the details of the SJC's findings and instead present the relevant jury testimony in the following section.

exchanged words. Kirwan then mentioned to Perry that he was worried that he was going to have to fight Meagher and Purcell. Approximately ten minutes later, Meagher came back into the bar and argued briefly with Kirwan.

At approximately 1:00 a.m., Kirwan and Perry left the bar. Outside, Meagher drove his truck alongside Kirwan, argued with him, and then parked his truck. Kirwan and Meagher approached each other in the street. Kirwan punched Meagher three times. The third time, he struck the front of Meagher's chest and had a shiny, metallic object in his hand. Kirwan then yelled that he was going to get a gun and walked toward his home, approximately fifty feet away. Meagher walked approximately thirty feet back toward his truck before falling flat on his face. Police and an ambulance arrived and Meagher was brought to a hospital, where he died. The cause of death was blood loss caused by a knife wound in his chest. A search of the scene later yielded a small knife with blood on it. The DNA of the blood on the knife matched Meagher's DNA.

## B. The Jury Trial

At trial, the prosecutor solicited testimony from Perry regarding the statements that Kirwan made before leaving the bar, ostensibly to record the pay-per-view movie. Perry and the prosecutor had the following colloquy:

> Q. Before [the defendant] left, Mr. Perry, did he make a statement to you about getting some type of weapon?

A.   He really didn't say it was a weapon.   He said something about a shank.

Q.   Tell us exactly what he said, would you?

A.   I couldn't exactly tell you what he said. He just said something about a shank.   He was worried about the two guys [sitting with his former girlfriend] on the other side, and he was worried about wanting to pick up a shank or something like that.

Q.   So, he said he was going home?

A.   He was going home for the taping, yes.

Q.   Said he was going to get a shank?

A.   He just said something about a shank.

Q.   How many times did he say it to you?

A.   I remember twice.

Q.   Did he say it differently the second time?

A.   No.

Q.   What did he say the second time, exactly, if you recall?

A.    Like I said, I had a lot to drink that night, and I would say he just mentioned something about a shank.   I didn't even know what it was.

Q.   Never seen a prison movie?

     [Defense Counsel]:   Objection.

     The Court:   Yes, sustained.

Q.   After he said this about the shank, did you see him leave?

A.   He left before 12:00, yes.

-5-

In his closing argument, the prosecutor relied in large part upon Perry's testimony to establish premeditation. The prosecutor stated a number of times, using various terms, that Kirwan went home to get a weapon.[2] In addition, his closing argument included a quotation of a statement that Kirwan supposedly made to Perry about the shank:

> It is the most critical piece of evidence, ladies and gentlemen, that statement to Brian Perry, "I'm going to go get my shank," not once, not twice, then going home and arming himself, because that shows beyond any reasonable doubt what his intentions were.
>
> Brian Perry can tell you all he wanted he didn't understand what that was about. Again, draw on your collective experience and common sense. I'm going to get my shank, but it gets better than that, because if you look

---

[2] First, the prosecutor said the following:

> He didn't like that fear in his belly, so he went home and he got his shank, and when you go into that deliberation room, think long and hard about what that tells you.
> What's that tell you about Scott Kirwan's intent, that he went home and got this knife and put it in his pocket and walked back to that barroom? Think long and hard about . . . what that says about the deliberate premeditation of this murder. He went home and armed himself.
> He went home and armed himself. . . .

(Emphasis added.) Later, the prosecutor said, "I suggest to you the evidence is clear that, when the defendant went back to his house into his room or into the kitchen, took this knife out, put it in his shorts and went back over to that barroom, that was deliberate premeditation." (Emphasis added.) Finally, the prosecutor said, "He was pumped up, he was looking for a fight, and he went and got his shank." (Emphasis added.)

                at the evidence on the whole, he comes back,
                which he didn't have to do.

(Emphasis added.)

## C.  The SJC Opinion

        On appeal to the SJC, Kirwan raised two arguments that
are relevant here.  First, he argued that the prosecutor had
committed prosecutorial misconduct by arguing a critical fact not
in evidence during his closing statement.  Second, Kirwan asserted
a related claim of ineffective assistance of counsel on the grounds
that his lawyer failed to object to the relevant portions of the
closing statement and failed to seek curative instructions.
Kirwan's first argument had two components.  He claimed that (1) it
was improper to ask the jury to conclude that Kirwan said he went
home to arm himself, and that he in fact did so, because these
conclusions were not grounded in the evidence, and (2) even if it
was proper to argue that the jury could draw these inferences, it
was improper for the prosecutor to argue that Perry <u>explicitly</u>
testified that Kirwan said "I'm going to go get my shank."

        The SJC dismissed both arguments.  First, apparently
addressing the first component of the prosecutorial misconduct
argument, it explained that "[c]ontrary to [Kirwan's] assertion,
the prosecutor's argument that [Kirwan] said he was going home to
get a 'shank' was supported by the evidence."  <u>Kirwan</u>, 860 N.E.2d
at 941.  According to the SJC, Perry's testimony about his
conversation with Kirwan shortly before Kirwan left the bar

-7-

"permitted an inference that [Kirwan] expressed an intention to go home, in part, to get a shank." Id. at 942. In handling the second component of this argument, the SJC said the following: "In his decision on the defendant's motion for a new trial, the judge observed that, even if the prosecutor had misquoted Perry as to what the defendant had said, 'the statement attributed to the defendant was fairly inferable from the evidence.' The argument was not improper." Id. The SJC then "add[ed] that the jury were instructed that it was their memory of the testimony that was controlling, not that of the attorneys or even the judge." Id. Having resolved the prosecutorial misconduct issue, the SJC simply noted, "Because there was no misconduct on the part of the prosecutor, there was no ineffective assistance of counsel for failure to object." Id.

## II. Discussion

Kirwan first argues that the prosecutor deprived him of his rights to a fair trial and due process by arguing in summation that Kirwan said he was going home to get a shank, and that he indeed went home to retrieve a shank, before killing Meagher. Kirwan contends that the prosecutor should not have encouraged the jury to draw these inferences because they were not grounded in the evidence; he also contends that it was improper for the prosecutor to misquote Perry as saying that Kirwan had told him "I'm going to go get my shank." Second, Kirwan argues that his right to

-8-

effective assistance of counsel was violated because his counsel failed to object and seek curative instructions when the prosecutor mentioned the shank during closing argument. We address each claim in turn after discussing the statutory framework for habeas review.

## A. The Statutory Framework

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may not grant habeas relief "with respect to any claim that was adjudicated on the merits in [s]tate court . . . unless the adjudication of the claim" resulted in a decision that either (1) "was contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d). If the relevant claim has not been adjudicated on the merits in state court, we review that claim de novo. Clements v. Clarke, 592 F.3d 45, 52 (1st Cir. 2010). In addition, AEDPA provides that in federal habeas cases, "a determination of a factual issue made by a [s]tate court shall be presumed to be correct" and "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). The parties disagree about whether any of the SJC's conclusions are entitled to the presumption of correctness under § 2254(e)(1) and also about the

-9-

applicability of 28 U.S.C. § 2254(d) here.  We address those issues below.

**B.  Denial of the Right to a Fair Trial**

**1.  Standard of Review**

We review the district court's denial of habeas corpus relief de novo.  Clements, 592 F.3d at 51.  "We may affirm . . . on any basis apparent in the record."  Chiang v. Verizon New England, Inc., 595 F.3d 26, 34 (1st Cir. 2010).

The parties dispute the applicability of two sections of AEDPA to Kirwan's prosecutorial misconduct claim.  The government contends that this court should treat as presumptively correct, under 28 U.S.C. § 2254(e)(1), the SJC's conclusion that the inference that Kirwan said he was going home to get a shank was supported by the record.  Kirwan, on the other hand, argues that the presumption of correctness under section 2254(e)(1) does not apply to that conclusion.  We determine below that the SJC correctly concluded that the evidence at trial permitted the inference that Kirwan said he returned home to get a shank.  Thus, we need not decide whether that conclusion is entitled to the presumption of correctness under section 2254(e)(1).  See Forsyth v. Spencer, 595 F.3d 81, 84 n.3 (1st Cir. 2010) (declining to determine whether section 2254(e)(1) presumption of correctness applies where petitioner could not prevail even under a standard arguably more favorable to him).

In addition, the parties dispute whether the SJC's determination that there was no prosecutorial misconduct is entitled to deference under section 2254(d)(1), and whether any related factual determinations are entitled to deference under section 2254(d)(2), assuming they are not entitled to deference under section 2254(e)(1). Section 2254(d) applies to claims that have been "adjudicated on the merits in [s]tate court." 28 U.S.C. 2254(d). "Deference to the state court's determination is warranted . . . if the court either expressly resolved the federal claim on its merits or adjudicated it under a state law standard that 'is at least as protective of the defendant's rights as its federal counterpart.'" Young v. Murphy, 615 F.3d 59, 64-65 (1st Cir. 2010) (quoting Foxworth v. St. Amand, 570 F.3d 414, 426 (1st Cir. 2009), cert. denied, 130 S. Ct. 1710 (2010)). The government argues that the SJC applied a state standard that is the functional equivalent of the federal standard when it relied on Commonwealth v. Duguay, 720 N.E.2d 458 (Mass. 1999), in resolving the prosecutorial misconduct issue. Thus, the government claims, the SJC's decision is entitled to deferential review under section 2254(d)(1), and any factual determinations that are not entitled to the presumption of correctness under section 2254(e)(1) are entitled to deferential review under section 2254(d)(2). Kirwan contends that the standard set out in Duguay is not as protective of his rights as the standard in Darden v. Wainright, 477 U.S. 168,

-11-

180 (1986), and Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974), and therefore he is entitled to de novo review. Because Kirwan cannot prevail even under the de novo standard, we assume without deciding that section 2254(d) is inapplicable here. See Obershaw v. Lanman, 453 F.3d 56, 66 (1st Cir. 2006) (declining to decide whether deferential AEDPA standard of review applies because petitioner would lose even under de novo standard).

## 2. Analysis

We first address Kirwan's contention that the prosecutor's argument that Kirwan said he was going home to get a shank and then went home to retrieve the shank was improper because it was not supported by the evidence. "The relevant question is whether the [prosecutor's] comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden, 477 U.S. at 181 (quoting Donnelly, 416 U.S. at 643). We conclude that both the inference that Kirwan returned home to retrieve a knife and the inference that he stated his intention to Perry were grounded in the evidence, and thus that the comments urging the jury to accept these inferences did not "so infect[] the trial with unfairness," Donnelly, 416 U.S. at 643, as to constitute a due process violation.

Kirwan correctly points out that at one point, when the prosecutor asked Perry if Kirwan had "[s]aid he was going to get a shank," Kirwan replied, "He just said something about a shank."

-12-

This testimony, in isolation, might suggest that Kirwan did not tell Perry that he was going home to get a shank and did not, in fact, retrieve a shank at home. Viewed, however, in light of the surrounding testimony, this statement does not negate the inference that Kirwan went home to get a shank. Prior to this statement, Perry testified as follows in response to a question from the prosecutor:

> Q. Before [the defendant] left, Mr. Perry, did he make a statement to you about getting some type of weapon?
>
> A. He really didn't say it was a weapon. He said something about a shank.

In his initial answer, Perry did not deny that Kirwan said he was going home to get something; he simply clarified that Perry did not refer to a weapon, but rather used the word "shank." The direct examination continued as follows:

> Q. Tell us exactly what he said, would you?
>
> A. I couldn't exactly tell you what he said. He just said something about a shank. He was worried about the two guys [sitting with his former girlfriend] on the other side, and he was worried about wanting to pick up a shank or something like that.

Here, Perry's answer again suggests that Kirwan was going someplace to pick up a shank.

Furthermore, the evidence at trial showed that (1) after making these statements, Kirwan went home; (2) Kirwan later returned to the bar; (3) during his fight with Meagher, he had a

-13-

shiny metallic object in his hand; (4) Meagher died of blood loss from a knife wound; and (5) a knife with blood matching the DNA of Meagher's blood was found at the scene. Given all of this evidence, it was proper for the prosecutor to argue in closing that Kirwan told Perry he was going home to retrieve a shank and then did so. Therefore, this argument did not violate Kirwan's constitutional rights.

We next address Kirwan's contention that the prosecutor violated his constitutional rights when he argued that Kirwan twice told Perry "I'm going to go get my shank." Perry never testified that Kirwan said "I'm going to go get my shank." Assuming that the prosecutor's statement was improper, the statement still did not result in a constitutional violation.

Where, as here, the allegedly objectionable statements do not implicate a specific right in the Bill of Rights, "[t]he relevant question is whether the [prosecutor's] comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden, 477 U.S. at 181 (quoting Donnelly, 416 U.S. at 643). "There is no precise federal standard governing due process claims based on a prosecutor's remarks." Dagley v. Russo, 540 F.3d 8, 15 n.3 (1st Cir. 2008). Darden and Donnelly, however, provide the relevant Supreme Court law. In Darden, one prosecutor stated in summation, among other things, that the defendant should only be let out of his prison

-14-

cell with a leash on, that he wished the victim had blown the defendant's face off, and that he wished the defendant had used his final bullet on himself. 477 U.S. at 181 n.12. In considering whether the closing argument violated the petitioner's right to due process, the Court noted that (1) the summation "did not manipulate or misstate the evidence," (2) the judge "instructed the jurors several times that their decision was to be made on the basis of the evidence alone, and that the arguments of counsel were not evidence," and (3) "[t]he weight of the evidence against petitioner was heavy." Id. at 182. The Court reasoned that this last factor was important because the "'overwhelming eyewitness and circumstantial evidence to support a finding of guilt on all charges' reduced the likelihood that the jury's decision was influenced by argument." Id. (quoting Darden v. State, 329 So. 2d 287, 291 (Fla. 1976)).

In Donnelly, the prosecutor commented that although the defendant and his counsel asked the jury to find the defendant not guilty, "I quite frankly think that they hope that you find him guilty of something a little less than first-degree murder." 416 U.S. at 640 (internal quotation marks omitted). The Court concluded that this comment did not deprive Donnelly of the right to a fair trial because (1) it was unclear that the jury would have concluded, as the Court of Appeals supposed it would, that Donnelly must have wanted to plead guilty to a lesser offense but had been

unable to do so, and (2) the judge instructed the jury generally that closing arguments were not evidence and specifically told them that the prosecutor's remark was not supported by evidence and thus should be disregarded.  Id. at 644.

Kirwan's strongest argument is that the prosecutor "manipulate[d] or misstate[d] the evidence," Darden, 477 U.S. at 182, when he stated that the "most critical piece of evidence" at trial was Kirwan's "statement to Brian Perry, 'I'm going to go get my shank.'"  According to Kirwan, had the prosecutor not misquoted Perry, the issue of whether Kirwan's acts were premeditated would have been a much closer call for the jury.  We conclude, however, that this comment was so minor a misstatement that it could not have "so infected the trial with unfairness as to make the resulting conviction a denial of due process," Donnelly, 416 U.S. at 643, especially given the context of the entire trial.  First, as in Darden, there was ample evidence to support a conviction for first-degree murder, so it is very unlikely that the comment influenced the jury's verdict. Perry's testimony that Kirwan "said something about a shank" before leaving the bar, and that Kirwan was "worried about wanting to pick up a shank or something like that," combined with the evidence that Kirwan, when he attacked Meagher after returning to the bar, had a shiny metallic object in his hand, and that Meagher died of blood loss from a knife wound, could easily convince the jury that Kirwan returned home to get the

-16-

murder weapon. Second, although the trial judge did not specifically address the comments, he did instruct the jury that (1) they should decide "what the facts are solely from the evidence admitted," (2) closing arguments were "not a substitute for the evidence," and (3) they should "follow [their] own recollection" of the evidence. Given how minor the misstatement was, that the evidence was overwhelmingly against Kirwan, and that the judge did instruct the jury that their recollection of the evidence was controlling, we conclude that the prosecutor's comments did not result in a fundamentally unfair trial.

## C. Ineffective Assistance of Counsel

Kirwan claims that because his attorney (1) failed to object to the prosecutor's statements regarding Kirwan returning home to get the shank and (2) failed to seek curative instructions following the summation, he was denied effective assistance of counsel. Each of these sub-claims applies to both (a) the prosecutor's general statements about Kirwan going home to get a shank, and (b) his misquotation of Perry as saying that Kirwan said "I'm going to go get my shank."

### 1. Standard of Review

The parties appear to agree that the issue of whether Kirwan's counsel provided ineffective assistance by failing to object to the prosecutor's statements should be reviewed under the deferential 28 U.S.C. § 2254(d)(1) standard. This is the correct

-17-

standard to apply to the claim that counsel's failure to object to the prosecutor's general statements regarding the shank constituted ineffective assistance of counsel.[3]  As for the failure to object to the misquotation, however, because we have assumed that the prosecutor's misquotation was improper, it would not make sense to give deference to the final conclusion that because there was no improper statement, there was no ineffective assistance.  Cf. Wiggins v. Smith, 539 U.S. 510, 534 (2003) (noting that the Court's review was "not circumscribed by a state court conclusion with respect to prejudice as neither of the state courts below reached this prong of the Strickland analysis").  Thus, we apply the de novo standard to this part of Kirwan's failure-to-object sub-claim.

Kirwan contends that his second sub-claim, regarding failure to seek curative instructions, should be reviewed de novo

---

[3]  In ruling on the ineffective assistance of counsel issue in Kirwan's case, the SJC cited Commonwealth v. Wright, 584 N.E.2d 621 (Mass. 1992).  See Kirwan, 860 N.E.2d at 941.  In Wright, the court applied the Mass. Gen. Laws ch. 278, § 33E standard to an ineffective assistance of counsel claim after explaining that the statutory standard -- which requires proof that (1) "there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge)" and (2) the "error was likely to have influenced the jury's conclusion" -- is more favorable to the defendant than the constitutional standard articulated in Strickland v. Washington, 466 U.S. 668 (1984).  Wright, 584 N.E.2d at 624.  Thus, the SJC appears to have reasoned that because the prosecutor committed no error, there was no violation of § 33E, and thus there was no constitutional ineffective assistance of counsel. Because the standard that the SJC employed is "at least as protective of the defendant's rights as its federal counterpart," we may defer under section 2254(d)(1) to its determination. Foxworth, 570 F.3d at 426.

-18-

because the SJC did not address or even mention it. Because Kirwan cannot prevail regardless of the standard of review, we apply the de novo standard to his claim regarding curative instructions.[4] See Obershaw, 453 F.3d at 66.

We have laid out the appropriate standards of review by addressing (1) Kirwan's failure-to-object argument in relation to (a) the prosecutor's general comments and (b) the prosecutor's misquotation, and then discussing (2) Kirwan's argument regarding curative instructions. Below, however, we analyze the substance of Kirwan's claims by first addressing (a) the prosecutor's general comments -- discussing both (1) the failure to object and (2) the failure to seek curative instructions -- and then turning our attention to (b) the prosecutor's misquotation.

## 2. Analysis

For the reasons discussed above, we have concluded that the prosecutor's general statements about Kirwan going home to get his shank were fairly inferable from the evidence. Therefore, the SJC did not unreasonably apply clearly established federal law[5] in

---

[4] We do not mean to suggest here that Kirwan could prevail under the de novo standard of review on his claim that his attorney was ineffective in failing to object to the prosecutor's general comments regarding the shank. Because the prosecutor's comments were fairly inferable from the evidence, as discussed above, his attorney need not have objected to them. Thus, Kirwan would lose even under the de novo standard of review.

[5] Kirwan does not contend that the SJC's decision was "contrary to" clearly established federal law.

concluding that the attorney's failure to object to these general comments did not violate Kirwan's constitutional rights. Furthermore, reviewing de novo Kirwan's claim that he was denied effective assistance of counsel when his attorney failed to seek curative instructions in response to these general comments, we conclude that his constitutional rights were not violated for the same reason; there was no need to seek curative instructions because the general comments were fairly inferable from the evidence.

The prosecutor's statement misquoting Perry requires slightly more analysis. In order to make out a claim of ineffective assistance of counsel, a petitioner must show (1) "that counsel's performance was deficient," which "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) "that the deficient performance prejudiced the defense," which "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland v. Washington, 466 U.S. 668, 687 (1984). In order to meet the prejudice prong, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is one 'sufficient to undermine confidence in the outcome.'" González-

<u>Soberal</u> v. <u>United States</u>, 244 F.3d 273, 278 (1st Cir. 2001) (quoting <u>Strickland</u>, 466 U.S. at 694).

Even assuming that Kirwan can meet the performance prong, he cannot meet the prejudice prong.  Given that the other evidence against him was overwhelming, as discussed above, Kirwan cannot demonstrate that there is a "reasonable probability" that the result of his trial would have been different if his attorney had objected to, or sought curative instructions regarding, the prosecutor's statements.  <u>Strickland</u>, 466 U.S. at 694.  The jury still almost certainly would have convicted him of first-degree murder given the evidence suggesting that he went home to get a shank, returned to the bar, and then killed Meagher using the shank.  Therefore, neither the failure to object nor the failure to seek curative instructions constituted ineffective assistance of counsel, and -- even reviewing the claims <u>de novo</u> -- we conclude that there was no constitutional violation here.

### III.  Conclusion

For the reasons stated, we affirm the district court's order.

**Affirmed**.