**UNITED STATES of America,**

v.

**Steven B. WILKINSON, Respondent.**

**Civ. No. 07–12061–MLW.**

United States District Court,
D. Massachusetts.

Aug. 20, 2009.

Jennifer A. Serafyn, Jennifer C. Boal, Mark J. Grady, Mark T. Quinlivan, United States Attorney's Office, Boston, MA, for Petitioner.

Timothy G. Watkins, Ian Gold, Federal Defender's Office, District of Massachusetts, Boston, MA, for Respondent.

## MEMORANDUM AND ORDER

WOLF, District Judge.

### I. SUMMARY

In February, 2007, Steven Wilkinson was concluding a federal sentence for being a felon in possession of a firearm which he began serving in 1991. The day before he was to be released from federal custody and turned over to the Commonwealth of Pennsylvania for detention due to a parole violation, the Bureau of Prisons certified Wilkinson as a sexually dangerous person under the pertinent provisions of the then new Adam Walsh Child Protection and Safety Act of 2006 (the "Adam Walsh Act"), 18 U.S.C. § 4248. The Bureau of Prison's certification was essentially based on the facts that Wilkinson had pled guilty to statutory rape in 1976, when he was nineteen years old, was convicted of rape in 1982, and pled guilty to indecent assault of a female in 1991.

The Bureau of Prison's certification constituted a request that Wilkinson be civilly committed as a sexually dangerous person. The court conducted a hearing and decided that there was a proper basis to detain Wilkinson pending a resolution of this case. *See United States v. Wilkinson* ("Wilkinson I"), 2008 WL 427295, at *11 (D.Mass. Feb. 14, 2008). Therefore, the certification resulted in Wilkinson's continued federal detention.

Wilkinson's case has presented many constitutional and other issues raised by the first federal statute to provide for the civil commitment of sexually dangerous individuals. After receiving the reports of two examiners, the court conducted an evidentiary hearing to determine whether the government had proven that Wilkinson is sexually dangerous.

The court also addressed Wilkinson's claim that the Adam Walsh Act is unconstitutional. In June, 2009, the court held that the Adam Walsh Act is unconstitutional because it exceeds Congress' power under the Commerce Clause of the United States constitution and is not necessary or proper to effectuate any other enumerated legislative or executive power. *See United States v. Wilkinson* ("Wilkinson II"), 626 F.Supp.2d 184, 185–86 (D.Mass.2009). This is an issue that has split the district courts and several circuits that have decided it. *Id.* at 186–87. The Supreme Court

will hear a case which should decide this issue in the coming term. *See United States v. Comstock*, 551 F.3d 274 (4th Cir. 2009), *aff'g* 507 F.Supp.2d 522, 540 (E.D.N.C.2007), *cert. granted* — U.S. ——, 129 S.Ct. 2828, 174 L.Ed.2d 551 (2009). In view of the uncertainty of the law and the risk that Wilkinson might be found to be sexually dangerous, the court stayed his release from federal custody, at least until the merit of the government's request for civil commitment was decided. *Wilkinson II*, 626 F.Supp.2d at 195.

The court is now addressing whether Wilkinson's civil commitment is justified assuming the Adam Walsh Act is constitutional. For the reasons described in detail in this memorandum, the government has failed to prove that Wilkinson is properly subject to civil commitment.

The Supreme Court has made clear that an inmate cannot be civilly committed merely because he may be dangerous if released. Rather, the constitution generally requires reliance on the criminal law to deter rational people from committing crimes and to imprison them if by committing a crime they nevertheless prove to be dangerous. Civil commitment is constitutionally permissible only if the government proves by clear and convincing evidence that a person is dangerous because he has a serious mental condition which causes him to have serious difficulty in making reasoned choices and controlling his behavior.

The government has not established that Wilkinson has a serious mental impairment which causes him to have serious difficulty in controlling his behavior generally or, as required in this case, will cause him to have serious difficulty in refraining from sexually violent conduct or child molestation if released. Like many prisoners, Wilkinson has an Antisocial Personality Disorder. No one has diagnosed Wilkinson as having pedophilia or any mental abnormality that involves unnatural sexual urges.

The government has not proven that Antisocial Personality Disorder alone ever causes a person to have serious difficulty in controlling his conduct. In essence, the evidence indicates that individuals with severe forms of that disorder may often make unlawful choices, but they are able to control their conduct.

In addition, Wilkinson's Antisocial Personality Disorder is not now severe, and the government has not proven that it causes him serious difficulty in controlling his behavior generally or will cause him serious difficulty in refraining from committing sexual crimes if released. Unlike many prisoners with that diagnosis, Wilkinson worked hard and generally behaved well while serving his long federal sentence. Moreover, Wilkinson will be in his mid-fifties when he is released from federal and state custody. The evidence indicates that both Antisocial Personality Disorder and the risk of sexual recidivism diminish substantially by that age. The evidence also demonstrates that substance abuse contributed considerably to Wilkinson's commission of the crimes that make him eligible to be considered for civil commitment. His substance abuse has been in remission while incarcerated. Wilkinson will be required to participate in substance abuse and sex offender treatment programs during the five years of his federal Supervised Release. In any event, as the government acknowledges, substance abuse is not a permissible basis for a civil commitment.

As the government has failed to prove that Wilkinson may be civilly committed under the Adam Walsh Act, he would ordinarily be entitled to be released now to the custody of the Commonwealth of Pennsylvania to begin serving a sentence for his parole violation. In the current circum-

stances, it may be appropriate to lift the stay of this case and to order Wilkinson's release for that purpose. Therefore, if the parties are unable to reach an agreement concerning the stay, the court will decide if it should be lifted.

## II. PROCEDURAL HISTORY

As described earlier, in February, 2007, Wilkinson was serving a federal sentence that began in 1991 for being a felon in possession of a firearm. He was certified as a sexually dangerous person for the purposes of the then new Adam Walsh Act on February 12, 2007, the day before he was scheduled to be released from federal custody. After a three-day hearing, in February, 2008, the court "found probable cause to believe that Wilkinson will have serious difficulty in refraining from sexually violent conduct in the future as a result of a possible antisocial personality disorder." *Wilkinson I*, 2008 WL 427295, at *11.

Wilkinson moved for a psychological examiner to be appointed and to report to the court regarding whether he is sexually dangerous. *See* 18 U.S.C. §§ 4247(b), (c). The court construed §§ 4247(b) and 4248(b) to permit the appointment of one court-designated examiner and, if requested, an examiner selected by the respondent. *See Wilkinson I*, 2008 WL 427295, at *12. Wilkinson requested that Dr. Barbara Schwartz be designated by the court as the sole examiner. The government requested that Dr. Anna Salter also be appointed as an examiner. The court declined to adopt the position of either party because it found that "§§ 4247(b) and 4248(b) are not intended to create a battle of experts selected by each party, or to allow the defendant to select the sole expert." *Id.*

The court subsequently designated two examiners. Dr. Barry Mills, a Board Certified Forensic Psychiatrist on the faculty of the Harvard Medical School who the parties agreed was qualified, was made the court-designated examiner. At Wilkinson's request, the court appointed Dr. Schwartz, the Program Director of the Maine Department of Corrections Sex Offender Treatment Program, as his designee. *Id.* at *14. The court allowed the government's proposed examiner, Dr. Salter, to provide expert assistance to the government. *See* Feb. 8, 2008 Order.

Dr. Mills and Schwartz each filed reports as required by 18 U.S.C. § 4247(c). Dr. Mills opined that Wilkinson was not sexually dangerous and should not be civilly committed. Dr. Schwartz disagreed.

With the agreement of the parties, the court decided to conduct a hearing on the merits before deciding Wilkinson's motion to dismiss or his motion for a *Daubert* hearing in the hope that a decision on the merits might be reached quickly and moot the complex issues presented by the motion to dismiss.

At the hearing on the merits, the court heard the testimony of Dr. Schwartz, Dr. Mills, and Wilkinson, and received many exhibits. The court declined to hear the testimony of Dr. Salter, in part because she had not examined Wilkinson and in part because, as held earlier, the Adam Walsh Act does not contemplate a battle of the parties' paid experts. *Wilkinson I*, 2008 WL 427295, at *12. On the sixth day of trial, Wilkinson moved for Judgment on Partial Findings pursuant to Fed.R.Civ.P. 52(c). He argued that even if the Adam Walsh Act's civil commitment scheme were valid, the government had not proven by clear and convincing evidence that Wilkinson would have a serious difficulty refraining from future sexual violence. The court took the matter under advisement.

The court subsequently heard oral argument on Wilkinson's motion to dismiss on the ground that the Adam Walsh Act ex-

ceeded Congress' power to legislate. The court allowed the motion to dismiss on the ground that the 18 U.S.C. § 4248 is unconstitutional because it exceeds Congress' authority under the Commerce Clause and the Necessary and Proper Clause of the constitution, U.S. Const. art. I, § 8. *Wilkinson II*, 626 F.Supp.2d at 185–86.

The court stayed Wilkinson's release pending the government's appeal to the First Circuit. *Id.* at 195. However, the court stated that it would reconsider the propriety of the stay if it decided that the government had failed to prove that Wilkinson's civil commitment is justified even if the Adam Walsh Act is constitutional. *Id.*

## III. THE LEGAL FRAMEWORK

■ The Adam Walsh Act authorizes the civil commitment of an individual proven by clear and convincing evidence to be a "sexually dangerous person." 18 U.S.C. § 4248(d). The clear and convincing standard requires the government in this case to "place in the ultimate factfinder [the court] an abiding conviction that the truth of its factual contentions are 'highly probable.'" *Colorado v. New Mexico*, 467 U.S. 310, 316, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1984) (quoting C. McCormick, Law of Evidence § 320, p. 679 (1954)). This burden is satisfied only when "the material [the government] offered instantly tilted the evidentiary scales in [its favor] when weighed against the evidence [the respondent] offered in opposition." *Colorado*, 467 U.S. at 316, 104 S.Ct. 2433. The First Circuit has described the standard as "more than a preponderance but less than beyond a reasonable doubt." *In re Pratt*, 462 F.3d 14, 21 (1st Cir.2006).

" '[S]exually dangerous person' means a person who has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others." 18 U.S.C. § 4247(a)(5).

" '[S]exually dangerous to others' with respect to a person, means that the person suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6).

■ The Adam Walsh Act essentially requires clear and convincing proof of four things: (1) the person has a qualifying conviction; (2) the person has a serious mental impairment; (3) as a result of that impairment the person cannot adequately control his behavior; and, particularly, (4) the person will because of that impairment have serious difficulty in refraining from molesting children or committing sexually violent crimes. The language of the Adam Walsh Act indicates that it was adopted in an effort to conform to the Supreme Court's decisions concerning the parameters of permissible civil commitment of sexually dangerous individuals, particularly *Kansas v. Crane*, 534 U.S. 407, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002), and *Kansas v. Hendricks*, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997).

The constitution generally requires reliance upon the criminal law to deal with dangerous people by threatening punishment in an effort to deter criminal conduct and protecting the community by imprisoning individuals who despite that threat have been proven beyond a reasonable doubt to have committed a crime. Therefore, "[a] finding of dangerousness, standing alone, is ordinarily not a sufficient ground upon which to justify indefinite involuntary commitment." *Hendricks*, 521 U.S. at 358, 117 S.Ct. 2072. In a case involving a prisoner who once committed a crime and had an Antisocial Personality Disorder that sometimes led to aggressive conduct and could not be effectively treated, the Supreme Court held that civil com-

mitment was not constitutionally permissible because this rationale for indefinite detention "would also be only a step away from substituting confinements for dangerousness for our present system which, with only narrow exceptions aside from permissible confinements for mental illness,[1] incarcerates only those who are proved beyond a reasonable doubt to have violated the criminal law." *Foucha v. Louisiana,* 504 U.S. 71, 82, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992). As the Supreme Court has explained, it is constitutionally important to distinguish:

> a dangerous sexual offender subject to civil commitment "from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings." 521 U.S. at 360, 117 S.Ct. 2072. That distinction is necessary lest "civil commitment" become a "mechanism for retribution or general deterrence"—functions properly those of criminal law, not civil commitment. *Id.* at 372–73, 117 S.Ct. 2072 (Kennedy, J., concurring); *cf. also* Moran, *The Epidemiology of Antisocial Personality Disorder,* 34 *Social Psychiatry & Psychiatric Epidemiology* 231, 234 (1999) (noting that 40%–60% of male prison population is diagnosable with antisocial personality disorder).

*Crane,* 534 U.S. at 412, 122 S.Ct. 867.

In *Hendricks,* the individual subject to commitment suffered from pedophilia. 521 U.S. at 360, 117 S.Ct. 2072. He had "a chilling history of repeated child sexual molestation and abuse." *Id.* at 354, 117 S.Ct. 2072. Indeed, Hendricks admitted that "he had repeatedly abused children whenever he was not confined." *Id.* He

"conceded that, when he [became] 'stressed out,' he [could] not 'control the urge' to molest children." *Id.* at 360, 117 S.Ct. 2072. The Supreme Court held that:

> The admitted lack of volitional control, coupled with a prediction of future dangerousness, adequately distinguishes Hendricks from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings. Hendricks' diagnosis as a pedophile, which qualifies as a "mental abnormality" under the Act, thus plainly suffices for due process purposes.

*Id.* Therefore, the Kansas statute at issue in *Hendricks* was held to provide for constitutionally permissible civil commitment. *Id.*

■ In *Crane,* the Supreme Court clarified and emphasized that the constitution only permits the civil commitment of a dangerous sexual offender pursuant to a statute that requires proof that a mental impairment significantly injures an individual's ability to control his behavior. *See* 534 U.S. at 412, 122 S.Ct. 867. As the Supreme Court explained, "[t]he presence of what the 'psychiatric profession itself classifie[d] . . . as a serious mental disorder [pedophilia] helped' " to cause the commitment of Hendricks to be properly characterized as "civil" rather than "criminal." *Id.* "And a critical distinguishing feature of that 'serious disorder' there consisted of a special and serious lack of ability to control behavior." *Id.* at 412–13, 122 S.Ct. 867.

The Court went on to explain that to establish a proper basis for civil commitment of an allegedly sexually dangerous person:

---

1. The "narrow exceptions aside from permissible confinements for mental illness" relate to the authority to detain defendants prior to trial in "carefully limited" circumstances in order to protect the power to prosecute and to reasonably assure the safety of the community. See *Foucha,* 504 U.S. at 81–82, 112 S.Ct. 1780; *United States v. Salerno,* 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987); *Greenwood v. United States,* 350 U.S. 366, 76 S.Ct. 410, 100 L.Ed. 412 (1956); *United States v. Perry,* 788 F.2d 100, 110 (3rd Cir.1986).

there must be proof of serious difficulty in controlling behavior. And this, when viewed in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself, must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case. 521 U.S. at 357–58, 117 S.Ct. 2072; *see also Foucha v. Louisiana,* 504 U.S. 71, 82–83, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992) (rejecting an approach to civil commitment that would permit the indefinite confinement "of any convicted criminal" after completion of a prison term).

*Id.* at 413, 122 S.Ct. 867. Crane was "a previously convicted sexual offender who, according to at least one of the State's psychiatric witnesses, suffer[ed] from both exhibitionism and antisocial personality disorder." *Id.* at 411, 122 S.Ct. 867. The Court remanded the case for a determination of whether this combination of conditions justified civil commitment. *Id.* at 415, 122 S.Ct. 867.

In doing so, *Crane* clarified several ambiguities in *Hendricks* relevant to the Adam Walsh Act and the instant case. It explained that, "*Hendricks* set forth no requirement of total or complete lack of control." The Kansas statute at issue in *Hendricks* and *Crane* requires only a " 'mental abnormality' " or " 'personality disorder' " that "makes it 'difficult, if not impossible, for the [dangerous] person to control his dangerous behavior.' " *Id.* at 411, 122 S.Ct. 867 (quoting *Hendricks,* 521 U.S. at 358, 117 S.Ct. 2072). Therefore, the "civil commitment of dangerous sexual offenders will normally involve individuals who find it particularly difficult to control their behavior. . . . [I]n ordinary English [ ]they are 'unable to control their dangerousness.' " *Id.* at 414–15, 122 S.Ct. 867.

The Supreme Court in *Crane* also stated that it had not "ordinarily distinguished for constitutional purposes among volitional, emotional, and cognitive impairments." *Id.* at 415, 122 S.Ct. 867. It held that the mental impairment constitutionally required to justify a civil commitment could be cognitive as well as volitional. *Id.* at 415., 122 S.Ct. 867 It also suggested, without holding, that the abnormality could be "emotional." *Id.*

The dissenters in *Crane* agreed on the fundamental distinction between sexually dangerous persons constitutionally subject to civil commitment and others who could only be dealt with in criminal proceedings. *See id.* at 420–21, 122 S.Ct. 867 (Scalia, J., with whom Thomas, J., joined, dissenting).

> Ordinary recidivists choose to reoffend and are therefore amenable to deterrence through the criminal law; those subject to civil commitment under the [Kansas statute], because their mental illness is an affliction and not a choice, are unlikely to be deterred. We specifically pointed this out in *Hendricks.* "Those person committed under the Act," we said, "are, by definition, suffering from a 'mental abnormality' or a 'personality disorder' that prevents them from exercising adequate control over their behavior. Such persons are therefore unlikely to be deterred by the threat of confinement." 521 U.S. at 362–63, 117 S.Ct. 2072

*Id.*

Thus, as the Seventh Circuit correctly characterized it:

> *Crane* held that the Constitution requires findings that separate inability to control from unwillingness to control— that is, to separate the sick person from the vicious and amoral one. The former is a proper subject of civil commitment; the wicked person, by contrast, must be left to the criminal law (with recidivist

enhancements). 534 U.S. at 413, 122 S.Ct. 867. The Court thought this rule necessary to prevent fear of recidivism from leading to indefinite preventative detention.

*Varner v. Monohan,* 460 F.3d 861, 864 (7th Cir.2006).

As indicated earlier, the Adam Walsh Act tracks the Supreme Court's requirements for the civil commitment of a sexually dangerous person. The standard of proof for a commitment under § 4248 is clear and convincing evidence. *See Foucha,* 504 U.S. at 76, 112 S.Ct. 1780 (citing *Addington v. Texas,* 441 U.S. 418, 433, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979)). The government must prove that the individual has qualifying convictions that act as "evidence of past sexually violent behavior." *Hendricks,* 521 U.S. at 357, 117 S.Ct. 2072.

The government must then demonstrate that the respondent now "suffers from a serious mental illness, abnormality, or disorder." 18 U.S.C. § 4247(a)(6). While the terms "mental illness" and "mental disorder" are regularly used by the medical profession, the term "mental abnormality" is not. However, the Supreme Court has "never required [ ] legislatures to adopt any particular nomenclature in drafting civil commitment statutes." *Hendricks,* 521 U.S. at 359, 117 S.Ct. 2072. The term "mental abnormality" was used in the Kansas statute at issue in *Hendricks. Id.* at 357, 117 S.Ct. 2072. It is permissibly incorporated in its federal counterpart.

■ In determining whether a "mental illness, abnormality, or disorder" is "serious," the court must assess "the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself," in order to "distinguish the dangerous sexual offender ... from the dangerous but typical recidivist convicted in an ordinary criminal case." *Crane,* 534 U.S. at 413, 122 S.Ct. 867.

■ Finally, the government must demonstrate that "as a result of" the "serious mental illness, abnormality, or disorder," a person "would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6). As the language of the statute makes clear, the mental illness, abnormality, or disorder, must be the cause of the difficulty. In addition, "there must be proof of serious difficulty in controlling behavior." *Crane,* 534 U.S. at 413, 122 S.Ct. 867.

## IV. FINDINGS OF FACT AND CONCLUSIONS OF LAW

■ In finding the facts of this case, the court has assessed the credibility of the witnesses who testified based in part on their observed demeanor, in part on the existence of corroborating or contradicting evidence, and in part on whether their testimony made sense. The court has recognized that it could believe all, part, or none of a witness' testimony. As indicated below, the court has found the testimony of Dr. Barry Mills to be more credible than the testimony of Dr. Barbara Schwartz on certain matters on which they disagreed.

The court concludes that the government has not proven by clear and convincing evidence that Wilkinson's civil commitment is justified. Wilkinson does have convictions for sexually violent conduct which make him eligible for possible civil commitment. However, the government has not proven: that Wilkinson's Antisocial Personality Disorder is now a serious mental disorder; that Antisocial Personality Disorder generally causes a person to have serious difficulty in controlling his behavior; that Wilkinson's Antisocial Personality Disorder causes him serious difficulty in controlling his behavior; or that as a result of his Antisocial Personality Disorder

Wilkinson will have serious difficulty refraining from molesting children or committing sexually violent crimes.

Wilkinson has three convictions which make him eligible for possible civil commitment. *See* 18 U.S.C. § 4248(d). Some of the circumstances of these convictions are relevant to the instant case.

Prior to the beginning of his most recent incarceration in 1991, Wilkinson had a long history of drug abuse which, among other things, prompted his detention in a juvenile facility in Pennsylvania. In 1976, Wilkinson pled guilty to statutory rape. He was then nineteen-years old. The victim was thirteen-years old. Both had been using drugs, including LSD, before the intercourse that resulted in Wilkinson being sentenced to two to four years in state prison.

In 1982, while on parole, Wilkinson committed a sexually violent crime. He assaulted and raped a woman with whom he had again been using drugs, including LSD. Wilkinson was convicted and served eight years in prison for that crime.

In 1991, again while on parole, Wilkinson pled guilty to indecent assault of a female friend who had been staying in his motel room. Wilkinson and the woman had been drinking. He was sentenced to one to two years in state prison.

Wilkinson possessed a gun in connection with the 1991 indecent assault in his motel room. As a result, he was charged in the United States District Court for the Middle District of Pennsylvania with being a felon in possession of a firearm. He pled guilty to that charge. As a result, Wilkinson was sentenced as a Career Offender to 210 months in prison. His sentence also included a five-year term of Supervised Release on conditions that require that he participate in sex offender and drug treatment programs.

As described earlier, Wilkinson was scheduled to be released from his federal sentence on February 14, 2008, and to be remanded to the custody of the Commonwealth of Pennsylvania. It appears that he will be required to serve a two-year sentence in Pennsylvania for a parole violation. However, on February 13, 2008, the Bureau of Prisons certified Wilkinson as a sexually dangerous person. He has been detained in federal custody since then.

The government has not proven by clear and convincing evidence that Wilkinson now has a "serious mental illness, abnormality, or disorder" as required for his civil commitment under 18 U.S.C. § 4248. It is undisputed that Wilkinson has an Antisocial Personality Disorder as defined in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision (the "DSM–IV–TR").[2] As Dr. Mills opined, Wilkinson also has Polysubstance Dependance, In Remission, Due to Incarceration. DSM–IV–TR § 304.80 at 293–94. This is a disorder related to taking of at least three drugs of abuse, including alcohol. *See id.* at 191, 293. Dr. Schwartz diagnosed Wilkinson as having Amphetamine Abuse and Hallucinogenic Abuse. *Id.* § 305.70 at 225, § 305.30 at 252. The government does not contend, and the court does not find, that any of Wilkinson's drug abuse diagnoses constitute a "mental illness, abnormality, or disorder" within the meaning of § 4247(a)(6).

No expert has diagnosed Wilkinson as having any paraphilia, meaning recurrent sexual urges, including pedophilia, which involves an urge for sexual activity with a prepubescent child. *Id.* at 566, 571. Nor

---

**2.** The DSM–IV–TR is regularly relied upon by the medical profession and the courts to define and diagnose mental illnesses, disorders and what legislatures and courts at times refer to as "mental abnormalities." *See, e.g., Crane,* 534 U.S. at 411, 122 S.Ct. 867.

is there any other evidence of such a mental abnormality within the meaning of § 4247(a)(6).

Dr. Schwartz diagnosed Wilkinson with "psychopathy," which she described as a collection of personality factors that are associated with recidivism. She views psychopathy as related to, but different from, Antisocial Personality Disorder. According to Dr. Mills, psychopathy was proposed for inclusion in the DSM–IV–TR, but rejected as a diagnosis distinct from Antisocial Personality Disorder. The DSM–IV–TR states that Antisocial Personality Disorder "has also been referred to as psychopathy. . . ." *Id.* at 702. Therefore, the court finds that the government has not proven that psychopathy is a distinct "mental illness, abnormality, or disorder" within the meaning of § 4247(a)(6). In addition, Dr. Schwartz's testimony does not credibly establish that Wilkinson suffers from psychopathy.

Therefore, it is necessary to determine, among other things, the severity of Wilkinson's undisputed Antisocial Personality Disorder, *see Crane,* 534 U.S. at 413, 122 S.Ct. 867, and determine whether it is "serious" in his case. The DSM–IV–TR, at 706, states that "[t]he essential feature of Antisocial Personality Disorder is a pervasive pattern of disregard for, and violations of, the rights of others that begins in childhood or early adolescence and continues into adulthood." The diagnostic criteria for Antisocial Personality Disorder are that:

A.   There is a pervasive pattern of disregard for and violation of the rights of others occurring since age 15 years, as indicated by three (or more) of the following:

(1) failure to conform to social norms with respect to lawful behaviors as indicated by repeatedly performing acts that are grounds for arrest

(2) deceitfulness, as indicated by repeated lying, use of aliases, or conning others for personal profit or pleasure

(3) impulsivity or failure to plan ahead

(4) irritability and aggressiveness, as indicated by repeated physical fights or assaults

(5) reckless disregard for safety of self or others

(6) consistent irresponsibility, as indicated by repeated failure to sustain consistent work behavior or honor financial obligations

(7) lack of remorse, as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another

B.   The individual is at least age 18 years.

C.   There is evidence of Conduct Disorder with onset before age 15 years.

D.   The occurrence of antisocial behavior is not exclusively during the course of Schizophrenia or a Manic Episode.

DSM–IV–TR at 706.

As Dr. Mills credibly explained, many of the variables used in diagnosing Antisocial Personality Disorder are "static." Therefore, the diagnosis may not fully take into account a person's current status. Wilkinson's diagnosis of Antisocial Personality Disorder is rooted in his conduct before being sentenced to federal prison in 1991. For example, in making her diagnosis Dr. Schwartz relied, in part, on certain undisputed historical facts that predate Wilkinson's incarceration, including his repeated arrests, his repeated assaults on others, and his reckless disregard for his own safety. *See* Ex. 24 at 20.

However, the DSM–IV–TR notes that:
Antisocial Personality Disorder has a chronic course but may become less evident or remit as the individual grows older, particularly by the fourth decade of life. Although this remission tends to

be particularly evident with respect to engaging in criminal behavior, there is likely to be a decrease in the full spectrum of antisocial behaviors and substance use.

*Id.* at 704. The evidence indicates that this has occurred in Wilkinson's case.

As Dr. Mills explained, many inmates with Antisocial Personality Disorder have behavior problems in prison. Wilkinson, however, has not. While in prison, Wilkinson has completed several education courses, including classes in customer service competency, Spanish, accounting, mathematics, business mathematics, and water-colors. *See* Ex. 22. Wilkinson also worked for 152 months for UNICOR, Federal Prison Industries, Inc., doing a variety of jobs ranging from basic construction tasks to machinery repair. He has also received several commendations and incentive bonuses for his work ethic, manner, and the quality of his work performance. *Id.;* Ex. 39.

Most recently, while at FMC Devens, Wilkinson worked as a companion, or nurse, for up to six inmates at a time. His responsibilities included bathing the inmates, changing their clothes, and taking them to medical appointments. Wilkinson attended seminars on Alzheimer's disease, dementia and caring for blind people. Wilkinson credibly described his work as a companion as the best job he had ever had, in part because it allowed him to give back to others. However, Wilkinson was terminated from the position after the Warden at FMC Devens decided that individuals committed under the Adam Walsh Act should not work at the hospital. *Id.* at 72.

Wilkinson's disciplinary record while serving his sentence was also excellent. During the initial sixteen years of his confinement he did not have a single disciplinary incident or case of misconduct.

However, after his civil detention, on May 15, 2008, while waiting in line for a meal, another inmate bumped Wilkinson and refused to apologize. Wilkinson made a calculated decision to respond to the incident because his entire cell block was present and the other inmates "would have been testing [him] and trying [him] as far as [his] being like a chump." Sept. 10, 2008 Tr. at 79.

Dr. Mills did not characterize Wilkinson's Antisocial Personality Disorder as "serious." In opining that it was "serious," Dr. Schwartz ignored all of Wilkinson's positive conduct while in federal prison, which substantially diminishes the credibility of her opinion on this issue. In any event, the government has not proven by clear and convincing evidence that Wilkinson's Antisocial Personality Disorder is a "serious" mental disorder within the meaning of § 4247(a)(6). *See United States v. Abregana,* 574 F.Supp.2d 1145, 1159 (D.Haw.2008) (in view of conflicting expert opinion court did not find that Abregana's hebephilia, which involved the sexual arousal to adolescents, is sufficiently severe to constitute a "serious" mental disorder).

The government has also not proven by clear and convincing evidence that Antisocial Personality Disorder generally causes a person to have "serious difficulty in controlling [his] behavior." *Crane,* 534 U.S. at 413, 122 S.Ct. 867. Nor has it proven that Wilkinson's particular Antisocial Personality Disorder causes him to have severe difficulty in controlling his behavior.

Dr. Schwartz testified that the question of whether someone with Antisocial Personality Disorder has diminished control of his conduct or only makes wrong, often unlawful choices "excites controversy in the field." Sept. 9, 2008 Tr. at 72. She characterized this as a "philosophical problem." *Id.* Nevertheless, Dr. Schwartz opined that Wilkinson was not able to control his behavior. *Id.*

Dr. Mills opined, however, that:

[I]n general, persons with personality disorders are cognitively aware of the implications of their choices and are not involuntarily compelled to act in a certain manner ... persons with antisocial personality traits tend to challenge rules, oppose authority figures, and break laws. However, neither of these phenomena are conditions which substantively impair cognitive understanding or volitional control of behavior. Personality disorders are primarily descriptive, a pattern of consistently exaggerated choices which persist despite negative social consequences.

Ex. 30 at 17. The other evidence in this case generally tends to support Dr. Mills' view and, in any event, makes Dr. Schwartz's conflicting position far less than clearly and convincingly correct.

The DSM–IV–TR itself states that, "[t]he fact that an individual's presentation meets the criteria for a DSM–IV–TR diagnosis does not carry any necessary implication regarding an individual's degree of control over the behaviors that may be associated with the disorder." DSM–IV–TR at xxxiii. Therefore, the fact that Antisocial Personality Disorder is included in the DSM–IV–TR is not evidence that the disorder ever, always, or in Wilkinson's case involves any serious difficulty in controlling behavior.

Although Dr. Schwartz disagreed, *see* Sept. 9, 2008 Tr. at 111, one of the learned articles brought to her attention states that it is not clinically appropriate to diagnose someone as a sexually dangerous person subject to civil commitment on the basis of a diagnosis of Antisocial Personality Disorder alone, without an additional diagnosis of paraphilia. Jack Vognsen & Amy Phenix, *Antisocial Personality Disorder is Not Enough: A Reply to Sreeivasan, Weinburger, and Garrick*, 32 J. Am. Acad. Psychiatry Law 440, 440 (2004). The authors explained that:

Unquestionably, an individual with antisocial personality disorder may commit sexually violent offenses. However, this order afflicts 50 to 70 percent of the ordinary prison population and is far more likely to result in nonsexual criminal behavior. Again, the diagnosis of antisocial personality disorder alone, without an attending diagnosis of paraphilia, would almost never lead to a finding that an offender would be likely, or very likely, to reoffend with another sexually violent act.

*Id.* at 442 (citations omitted).

Indeed, an article which names Dr. Schwartz as a co-author is consistent with the conclusion that Antisocial Personality Disorder does not generally involve the type of lack of control necessary to justify a civil commitment based on sexual dangerousness. *See* Robert Prentky, Barbara Schwartz, et al, *Sexually Violent Predators in the Courtroom: Science on Trial*, 12 Psychol. Pub. Pol'y & L. 357, 368 (2006). In that article, the authors discuss the controversy concerning whether Antisocial Personality Disorder can be a proper basis for a civil commitment. *Id.* It states, in part, that:

As Cornwell (1998) noted, "states may well argue that APD is, generally speaking, a sufficient ground for psychiatric commitment because it is characterized, *inter alia*, by chronic impulsivity, irresponsibility, aggressiveness, and unlawful behavior" (p. 397). Such a definition for constitutionally adequate mental disorder, however, would cast an exceedingly broad net—anywhere between 50% and 75% of the prison population might qualify for civil commitment on the basis of an APD diagnosis—and thus violate a key premise of the Supreme Court's holdings, that [Sexually Violent Persons'] commitments must target a small

subgroup that is somehow distinguished from the ordinary dangerous recidivist. This analysis notwithstanding, one could envision a constellation of antisocial traits that fulfill the requirements for APD and come closer to satisfying the more particularized constitutional requirements for civil commitment. For example, consider an individual for whom the core APD traits include a reliably increased likelihood of sexual assault (as opposed to any other nonsexual criminal act). Such traits might well include elements of hostile or negative masculinity, "con" attitudes, misogynistic attitudes, sexual entitlement, sexual preoccupation, or other indices of current hypersexuality (e.g., Knight & Sims–Knight, 2003; Malamuth, 2003).

*Id.* (citing and quoting J.K. Cornwell, *Understanding the Role of the Police and Parens Patriae Powers in Involuntary Civil Commitment Before and After Hendricks,* 4 Psychol. Pub. Pol'y & L. 277, 377–413. (1998)).[3]

As Dr. Schwartz agreed, there is no evidence that Wilkinson now has any "indices of hypersexuality," including "sexual preoccupation," "sexual entitlement," or "misogynistic attitudes." Sept. 9, 2008 Tr. at 106. For example, there is no evidence that he has while in federal prison behaved improperly towards female staff or been discovered engaging in any other conduct that would suggest that he has sexual urges that are difficult for him to control.

The instant case, therefore, contrasts with some of the decisions on which the government relies in contending that Antisocial Personality Disorder is a proper predicate for the civil commitment of Wilkinson. As noted earlier, *Crane* involved an inmate with a diagnosis of exhibitionism

as well as Antisocial Personality Disorder, whose case was remanded for determination of whether that combination of conditions justified his commitment. *See* 534 U.S. at 411, 415, 122 S.Ct. 867. In *Brock v. Seling,* 390 F.3d 1088, 1090 (9th Cir. 2004), in addition to evidence of an Antisocial Personality Disorder, there was expert testimony that "Brock suffered from a paraphilia that rendered him unable to control his desire to rape." In *Linehan v. Milczark,* 315 F.3d 920, 928 (8th Cir.2003), in addition to being diagnosed with Antisocial Personality Disorder, the inmate had escaped and attacked a young girl, been aggressive toward prison staff, and left a visit with his wife and seven-year old step daughter to masturbate after playing with the girl. *Id.* All of these facts contributed to the conclusion that Linehan could not control himself. *Id.* Similarly, in *Adams v. Bartow,* 330 F.3d 957, 961 (7th Cir.2003), Adams' commitment was "based on more than just that he was a convicted sex offender with [Antisocial Personality Disorder]."

As described earlier, in *Foucha* the Supreme Court rejected the assertion that a person who has committed a crime and been diagnosed with "an Antisocial Personality Disorder that sometimes leads to aggressive conduct … may be held indefinitely." 504 U.S. at 82, 112 S.Ct. 1780. In contrast to many inmates, with one exception Wilkinson has not even engaged in any violent or aggressive conduct during his eighteen years in prison.

In any event, the government has not proven by clear and convincing evidence that Antisocial Personality Disorder generally involves a serious difficulty in controlling behavior [4] or that it causes such difficulty in Wilkinson's case.

---

**3.** Dr. Schwartz testified that, despite being named as a co-author, she never read this section of the article. Sept. 4, 2008 Tr. at 67.

**4.** Although the court has not relied on it, there is additional expert literature that was not introduced into evidence which reinforces the conclusion that Antisocial Personality Dis-

The government has not only failed to prove that Wilkinson's Antisocial Personality Disorder causes him to have serious difficulty in controlling his behavior generally, it has also failed to present clear and convincing evidence that as a result of his Antisocial Personality Disorder Wilkinson will have serious difficulty in refraining from child molestation or sexually violent conduct if he is released. Dr. Schwartz and Dr. Mills disagreed on this issue. Once again, Dr. Schwartz's testimony is not convincing.

Dr. Schwartz and Dr. Mills each administered to Wilkinson the Static–99, which is an actuarial risk assessment instrument.[5] Wilkinson's scores on the Static–99 as calculated by both examiners indicate that he is at a high risk to commit another sexual offense. However, as Dr. Mills testified, the test focuses on historic or static risk factors which do not change and, therefore, do not take into account Wilkinson's positive performance in prison since 1991. Nor are the tests specific to offenders with an Antisocial Personality Disorder rather than pedophilia or some mental illness closely associated with sexual violence. Rather, according to Dr. Schwartz, the sample for the Static–99 was a mixed group of sex offenders, 70% of whom were child molesters rather than rapists such as Wilkinson. Sept. 4, 2008 Tr. at 109–10.

Dr. Schwartz also scored Wilkinson on the Rapid Risk Assessment for Sexual Offense Recidivism (the "RRASOR"), which focuses on the deviant sexual pathway to recidivism. Wilkinson scored in the Low Risk category on this instrument. However, on a new test administered by Dr. Schwartz, the Risk Matrix 2000, he scored in the High Risk category. Once again, it does not appear that these tests focus specifically on the risk presented by individuals with Antisocial Personality Disorder.

The tests do take into account a history of substance abuse. Wilkinson had been using LSD before committing each of the first two offenses and was drunk at the time of the third. Dr. Mills persuasively opined that Wilkinson's sexually violent "offenses appear to have been primarily influenced by substance intoxication/abuse," rather than by his Antisocial Personality Disorder. *See* Ex. 30 at 14.

Dr. Mills testified that due to his incarceration Wilkinson's polysubstance abuse is in remission. Wilkinson has not sought or received drug treatment while in prison. However, he credibly testified that drugs

---

order generally does not involve the serious difficulty in controlling behavior necessary to justify a civil commitment. For example, University of Pennsylvania professor Stephen Morse has written:

"Personality disorder" is a recognized category of psychiatric diagnoses, but people with personality disorders rarely suffer on that basis alone from the types of psychotic cognition or extremely severe mood problems that are the standard touchstones for a finding of non-responsibility. Most are perfectly in touch with reality, their instrumental rationality is intact, and they have adequate knowledge of the applicable moral and legal rules that apply to their conduct. Although their abnormalities might make it harder for them to behave well, they seldom manifest the grave problems that might satisfy an insanity defense or even warrant a common-sense excuse on the ground that the person cannot "help" himself or herself. Stephen Morse, *Uncontrollable Urges and Irrational People*, 88 Va. L.Rev. 1025, 1046–47 (2002).

5. As agreed by the parties, the court has not done a *Daubert* analysis of the Static–99 or Rapid Risk Assessment of Sexual Offense Recidivism. However, they are tests that have been relied upon in other cases. *See United States v. Shields*, 2008 WL 544940, *1 (D.Mass. Feb. 26, 2008); *In re Commitment of Simons*, 213 Ill.2d 523, 535–39, 290 Ill.Dec. 610, 821 N.E.2d 1184 (2004).

are available in prison and he has refrained from using them.

In addition, there is a detainer lodged against Wilkinson for violation of his Pennsylvania parole. Therefore, when he is released from federal custody, he will be returned to the custody of the Commonwealth of Pennsylvania.

■ After being released from state custody, Wilkinson must serve five years on federal Supervised Release. As indicated earlier, the conditions of his Supervised Release include drug and sex offender treatment. These conditions are properly considered in assessing any future risk that Wilkinson may pose. *See United States v. Sharkany*, 133 F.3d 919, 1998 WL 17031, *2 (4th Cir.1998). The federal Chief Probation Officer for the Middle District of Pennsylvania is aware of Wilkinson, will require that he participate in the prescribed drug and sex offender treatment programs, and represents that Wilkinson's Supervised Release will be revoked if he fails to participate. *See* Ex. 40 (Affidavit of Leonard R. Bogart). The fact that Wilkinson will be closely supervised for five years, and the conditions of his release, diminish the risk that he will commit crimes generally, or sexual crimes particularly, if he is not civilly committed.[6]

Wilkinson's age when he is released should also reduce the risk that he presents. Wilkinson is now 53 years old. The evidence indicates that he may spend two years in the custody of the Commonwealth of Pennsylvania when released from federal detention. If so, he will be about 60 years old when he completes his term of Supervised Release. Dr. Mills explained that most individuals with Antisocial Personality Disorder tend to burnout and stop

misbehaving in their fourth decade of life. Wilkinson's good conduct in prison is consistent with this pattern.

In addition, all of the evidence indicates that the risk of sexual recidivism declines with age. Even for child molesters released after age sixty, the recidivism rate is very low (3.8%). *See* R. Karl Hanson, *Recidivism and Age: Follow–Up Data From 4,673 Sexual Offenders*, 17 J. Interpersonal Violence 1046, 1059 (2002). As Dr. Schwartz acknowledged, for individuals convicted of multiple sex offenses the risk of recidivism dramatically declines at age sixty and the consensus in the learned literature is that people over age sixty do not commit sexual offenses. *See* Sept. 9, 2009 Tr. at 143.

In view of the foregoing, the government has not proven that Wilkinson now has a mental condition that causes him serious difficulty in controlling his behavior generally or that will cause him serious difficulty in refraining from sexual misconduct if released. In essence, Wilkinson represents the type of inmate about whom the Supreme Court was concerned in *Foucha, Hendricks,* and *Crane.* He has been properly diagnosed with Antisocial Personality Disorder. That, however, does not distinguish him from many other prisoners. Drs. Mills and Schwartz estimate that about a third of all prisoners have Antisocial Personality Disorder. *See* Sept. 5, 2008 Tr. at 110; Sept. 3, 2008 Tr. at 96–97. In *Crane,* the Supreme Court favorably cited an article that noted that 40–60% of male prisoners were diagnosable with Antisocial Personality Disorder. *See* 534 U.S. at 412, 122 S.Ct. 867. Other research referenced in the testimony indi-

---

**6.** Dr. Schwartz was not aware that Wilkinson would be on Supervised Release on conditions that include drug and sex offender treatment when she formed her opinion that he was likely to have serious difficulty in refraining from committing sexual crimes in the future.

cates that the number may be as high as 50–70%. *Vognsen, supra*, at 442.

The release of any prisoner entails some risk of recidivism. However, in the absence of clear and convincing proof that a serious mental impairment causes an individual to have serious difficulty in controlling his behavior, the constitution requires reliance on the criminal law, rather than a civil commitment, to deal with that risk. *See Crane*, 534 U.S. at 412, 122 S.Ct. 867; *Hendricks*, 521 U.S. at 358, 117 S.Ct. 2072; *Foucha*, 504 U.S. at 82–3, 112 S.Ct. 1780; *Varner*, 460 F.3d at 864. As the government has not presented such clear and convincing proof, Wilkinson may not be civilly committed. Having served his federal sentence, he would ordinarily now be ordered released from federal custody.

## V. THE STAY

In its June 22, 2009 decision, the court found § 4248 unconstitutional. *Wilkinson II*, 626 F.Supp.2d at 185–86. However, it stayed Wilkinson's release. The stay was based in part on the split in the Circuits on the constitutionality of the Adam Walsh Act, *id.* at 195, which the Supreme Court granted a writ of certiorari to resolve. *See United States v. Comstock*, 551 F.3d 274 (4th Cir.2009), *aff'g* 507 F.Supp.2d 522, 540 (E.D.N.C.2007), *cert. granted* —— U.S. ——, 129 S.Ct. 2828, 174 L.Ed.2d 551 (2009). It was also based in part on the possibility that the court would find Wilkinson to be sexually dangerous. *Id.* The court stated, however, that it would, if requested, reconsider the propriety of the stay if there were a material charge in circumstances, including a finding that Wilkinson has not been proven to be a sexually dangerous person subject to civil commitment. *Id.* As the court wrote, "such a finding might alter the balance of hardships, particularly the court's assessment of the risk to the community as balanced against the irreparable injury that an unlawful extension of the detention of Wilkinson ... may entail." *Id.*

Such a change in circumstances has now occurred. Reconsideration of the stay is, therefore, appropriate. Thus, the parties are being ordered to confer concerning the stay and to brief the issue if they do not reach agreement on whether it should be lifted.

## VI. ORDER

In view of the foregoing, it is hereby ORDERED that:

1. The government's request that Steven B. Wilkinson be determined to be a sexually dangerous person subject to civil commitment pursuant to 18 U.S.C. § 4245 (Docket No. 1) is DENIED.

2. The parties shall confer and, by September 4, 2009, report whether they have reached an agreement concerning whether the stay concerning Wilkinson ordered on June 22, 2009, should be lifted. If they have not reached such an agreement, they shall file memoranda in support of their respective positions concerning whether the stay should be continued. *See Hilton v. Braunskill*, 481 U.S. 770, 776, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987); *Canterbury Liquors & Pantry v. Sullivan*, 999 F.Supp. 144, 149 (D.Mass.1998).