# United States Court of Appeals

## For the First Circuit

No. 09-1685

JOHN YOUNG,

Petitioner-Appellant,

v.

ROBERT MURPHY, JR., SUPERINTENDENT,
MASSACHUSETTS TREATMENT CENTER,

Respondent-Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, U.S. District Judge]

Before

Torruella and Lipez, Circuit Judges,
and Barbadoro,[*] District Judge.

Michael A. Nam-Krane on brief for appellant.
Eva M. Badway, Assistant Attorney General, Criminal Bureau,
with whom Martha Coakley, Attorney General, were on brief, for
appellee.

August 10, 2010

---

[*]Of the District of New Hampshire, sitting by designation.

**BARBADORO**, **District Judge**.    John Young was civilly committed to the Massachusetts Treatment Center pursuant to Chapter 123A of the Massachusetts General Laws after a state court jury found that he was a "sexually dangerous person."    The jury's verdict was affirmed on appeal in state court and Young's habeas corpus petition was rejected by the district court.    He argues in this appeal that the jury's verdict violates his Fourteenth Amendment right to substantive due process because it authorizes his commitment without proof that he suffers from a sufficiently serious mental impairment.

## I.

Shortly before Young completed a state prison sentence for a 1997 indecent assault and battery, the Commonwealth filed a petition to commit him as a sexually dangerous person pursuant to Chapter 123A of the Massachusetts General Laws.

### A.    Chapter 123A

Massachusetts law allows for the civil commitment of a person convicted of a sexual offense if the person "suffers from a mental abnormality or personality disorder which makes the person likely to engage in sexual offenses if not confined to a secure facility."    Mass. Gen. Laws ch. 123A, § 1.    The statute explains that a "mental abnormality" is a "congenital or acquired condition of a person that affects the emotional or volitional capacity of the person in a manner that predisposes that person to the

commission of criminal sexual acts to a degree that makes the person a menace to the health and safety of other persons." Id. A "personality disorder" is defined as "a congenital or acquired physical or mental condition that results in a general lack of power to control sexual impulses." Id.

Chapter 123A provides that the court must first conduct a hearing to determine whether there is probable cause to believe that an individual is a sexually dangerous person. Id. ch. 123A, § 12. If probable cause exists, the individual is committed to a treatment center "for the purpose of examination and diagnosis under the supervision of two qualified examiners," who file written reports with the court that include diagnoses and opinions as to whether the individual is sexually dangerous. Id. ch. 123A, § 13. The individual is tried before a jury unless he affirmatively waives that right. Id. ch. 123A, § 14.

In Young's case, the court followed the steps mandated by the statute and the proceedings culminated in a jury trial.

**B.  The Trial**

The parties stipulated that Young was eligible for civil commitment based upon his conviction for rape in 1981 and for indecent assault and battery in 1997, both of which qualify as sexual offenses under Chapter 123A. To meet its burden with respect to the other elements of its commitment petition, the Commonwealth called three psychologists, Drs. Robert Joss, Barbara

Quiñones, and J. Leonard Peebles, each of whom opined that (1) Young suffers from antisocial personality disorder ("APD"),[1] (2) his APD results in a general lack of power to control his sexual impulses, and (3) his APD makes him likely to engage in sexual offenses if he is not confined to a secure facility.

### 1. Difficulty Controlling Non-Sexual Impulses

All three experts testified concerning Young's impulsivity, not only in order to justify their diagnoses of APD, but also to explain how they had each reached the conclusion that Young was a sexually dangerous person. The experts supported their testimony by citing numerous examples drawn from reports and other records that documented Young's difficulty in controlling his impulses.

A series of reports detailed Young's history as a child and adolescent. According to these documents, Young's mother

---

[1] According to the Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), the authoritative reference used in diagnosing mental disorders, an individual suffers from APD if he meets four criteria. First, he must pervasively disregard the rights of others, as indicated by at least three of the following: (1) "failure to conform to social norms with respect to lawful behaviors," (2) "deceitfulness," (3) "impulsivity," (4) "irritability and aggressiveness," (5) "reckless disregard for [the] safety of self or others," (6) "consistent irresponsibility," and (7) "lack of remorse." Second, he must be at least eighteen years old. Third, he must have exhibited symptoms of "conduct disorder," another DSM-IV disorder that is also characterized by a failure to abide by social norms, beginning before the age of fifteen. Finally, his antisocial behavior must not be caused exclusively by schizophrenia or a manic episode. American Psychiatric Association, Diagnostic and Statistic Manual of Mental Disorders 706 (4th ed. text rev. 2000).

reported that he had always lacked an inner control mechanism. Young briefly attended a Head Start program, but his behavior could not be controlled there. From approximately the age of seven until the age of eleven, Young attended an alternative school in Lowell. Because of his educational needs and his aggressive outbursts, the Department of Public Welfare then placed Young at St. Ann's Home, a residential treatment facility in Methuen, Massachusetts, where he lived for approximately three years. At St. Ann's, Young pushed and shoved female staff members, frequently attacked younger children, assaulted a staff member with a pool cue, threatened an elderly man with a knife, and was involved in a breaking and entering. When Young visited his family, he physically assaulted his mother and sister; his mother even reported that she feared for her life during one attack. Eventually, the staff at St. Ann's concluded that they, like the staff at Head Start, could not contain Young's behavior. Young was next placed in a program at the Hayden Inn in Dorchester, Massachusetts. There, he frequently ran away, but he did not display aggressive behavior, as most of the other residents were larger than he was. Because officials eventually determined that even the Hayden Inn program could not meet his needs, Young was sent to the Danvers State Hospital in Danvers, Massachusetts for a ten-day observation and ultimately enrolled in the Centerpoint Residential Adolescent Program in Tewksbury, Massachusetts. At Centerpoint, Young continued his

violent behavior and was involved in numerous criminal activities, including theft and assault.

Unsurprisingly, the three experts testified that Young's difficulties as a child and adolescent were significant because they demonstrated his long-standing inability to control his impulses. Joss specifically noted that Young "had a great deal of difficulty controlling his behavior[,] even while [he was at St. Ann's Home,] a residential facility." Peebles emphasized the significance of the fact that multiple previous clinicians had concluded that Young had a severe impulse control problem.

Young fared no better while incarcerated than he had in the residential placements of his youth. Documents relied on by Joss revealed that Young received at least 240 disciplinary reports during the approximately seventeen years in which he was incarcerated in state prison between 1981 and February 2002. In one particularly vicious incident, Young got into a verbal argument with corrections officers, attempted to bite one officer's fingers, bit another officer on the forearm, causing deep puncture wounds, and told that officer, "Now you got AIDS, [be]cause I do." Joss and Quiñones observed that this institutional history reflected a significant lack of impulse control; Joss emphasized that even when he was being watched constantly, Young could not control himself.

Young's behavior at the Massachusetts Treatment Center in Bridgewater, Massachusetts, where he was housed and treated while

he awaited his civil commitment trial, also supported the experts' opinion testimony. According to reports, in December 2002, Young disrupted his unit by yelling to staff members, "Why don't you pieces of shit come in here so I can fuck you all up?" On January 9, 2003, while awaiting a disciplinary hearing, Young yelled, "If you fucking people give me more time up here, just watch and see how I act," and he told officers he would "rip out and destroy this fucking place." That afternoon, he flooded his cell and told an officer, "This [has just] begun[;] I'm going to break your neck." The next day, Young again flooded his cell and, when confronted by an officer, said, "This has just begun[;] I'm going to smear shit all over the walls." Joss and Peebles emphasized that the fact that Young's disruptive behavior continued even at the Massachusetts Treatment Center, and in the presence of corrections officers, demonstrated that he had substantial difficulty in controlling his impulses.

## 2. Difficulty Controlling Sexual Impulses

All three experts also testified specifically about Young's difficulty in controlling his sexual impulses.

Police reports that the experts examined revealed that in 1981, at the age of nineteen, Young raped a woman he had met at a bar. After asking his victim for a ride home and directing her to a secluded area, he pushed her out of her car, tore off her blouse and bra, and demanded that she remove her pants while threatening

her with a "magnum." During intercourse, the woman struggled and screamed; Young responded by hitting her and biting her breast. In 1997, while Young was on probation for armed robbery, he approached a fifteen-year-old girl on the street, grabbed her shoulder to turn her around, and asked her if she wanted to party as he touched her breasts. All three experts concluded that Young's two prior sexual offenses were evidence of his difficulty in controlling his sexual impulses. Joss explained that the fact that Young committed the 1997 offense while on probation, and committed the 1981 and 1997 crimes against people unfamiliar to him, demonstrated impulsiveness. In addition, Joss and Quiñones agreed that the public location of Young's 1997 attack underscored his lack of impulse control.

Another set of reports from the early 1990s noted that Young had made obscene phone calls to the wife of a corrections officer and a J.C. Penney store while he was incarcerated. Joss and Quiñones both testified that the phone calls demonstrated Young's difficulty in controlling his sexual impulses.

Finally, a March 2002 incident report from the Massachusetts Treatment Center stated that Young was found to be in possession of internet-generated, sexually explicit poems with a pornographic picture on the bottom of each page, a magazine cut-out depicting female frontal nudity, and a book with several pages depicting male and female nudity. Joss and Quiñones emphasized

that the fact that Young had acquired sexually explicit contraband even while he was receiving sex offender treatment and awaiting his civil commitment trial demonstrated his extreme difficulty in controlling his sexual impulses.

### 3. The Jury Instructions and Verdict

At the conclusion of Young's civil commitment trial, the judge instructed the jury that it could only find Young to be a sexually dangerous person if the Commonwealth had proven beyond a reasonable doubt that (1) Young had been convicted of a sexual offense as defined by the relevant statute, (2) Young suffered from a mental abnormality or personality disorder, and (3) as a result of that abnormality or disorder, Young was likely to engage in sexual offenses in the future if not confined to a secure facility. The judge made clear that the Commonwealth was proceeding under the theory that Young suffered from a personality disorder, and defined "personality disorder" as "a congenital or acquired physical or mental condition . . . that results in a general lack of power to control sexual impulse[s]."

After deliberating, the jury found that Young was a sexually dangerous person.

## C. The Appeals

Young unsuccessfully challenged the jury's verdict in the Massachusetts Court of Appeals. See Commonwealth v. Young, No. 05-P-728, 2006 WL 1042916, at *2 (Mass. App. Ct. Apr. 20, 2006). He

-9-

then filed a petition for a writ of habeas corpus in federal district court after he was denied leave to obtain further review in the Massachusetts Supreme Judicial Court. The district court rejected Young's petition in a thoughtful decision but later issued a certificate of appealability.

## II.

Young bases his appeal on a series of Supreme Court decisions that address the circumstances under which the due process clause permits a person to be civilly committed based in part upon a determination of future dangerousness. See Addington v. Texas, 441 U.S. 418 (1979); Foucha v. Louisiana, 504 U.S. 71 (1992); Kansas v. Hendricks, 521 U.S. 346 (1997); Kansas v. Crane, 534 U.S. 407 (2002). These decisions make clear that while a state may civilly commit a dangerous individual to protect the public in certain circumstances, it may not use civil commitment to punish past criminal conduct, Crane, 534 U.S. at 412, to deter others from engaging in criminal behavior, id., or to confine an individual whose dangerousness is not the product of "some additional factor, such as a 'mental illness,'" Hendricks, 521 U.S. at 358; Foucha, 504 U.S. at 77-79. When a commitment decision is premised upon an individual's impaired volition, the court has also held that a mental impairment will be sufficient to distinguish ordinary recidivists from the dangerously mentally ill when the evidence

-10-

demonstrates that the impairment results in "serious difficulty in controlling behavior." Crane, 534 U.S. at 413.

Relying on these decisions, Young presents two related substantive due process claims. First, he broadly argues that the jury's verdict cannot stand because it was based on a diagnosis of APD, which Young claims can never serve as a sufficiently serious mental disorder to justify a civil commitment decision. Alternatively, Young argues that the verdict is invalid even if APD cannot be categorically excluded as a predicate for civil commitment because the Commonwealth failed to prove that APD manifests itself in his case in a way that seriously impairs his ability to control his sexual impulses. We address both arguments after identifying the standard of review that we employ in adjudicating Young's claim.

## A. **AEDPA**

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), "the level of deference owed to a state court decision hinges on whether the state court ever adjudicated the relevant claim on the merits or not." Clements v. Clarke, 592 F.3d 45, 52 (1st Cir. 2010), cert. denied, 78 U.S.L.W. 3743 (U.S. June 21, 2010). Unadjudicated claims are reviewed de novo. Id. Deference to the state court's determination is warranted, however, if the court either expressly resolved the federal claim on its merits or adjudicated it under a state law standard that "is at

-11-

least as protective of the defendant's rights as its federal counterpart." Foxworth v. St. Amand, 570 F.3d 414, 426 (1st Cir. 2009), cert. denied, 130 S. Ct. 1710 (Mar. 1, 2010). Where deferential review is employed, a writ of habeas corpus may not issue unless the adjudication either (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established [f]ederal law as determined by the Supreme Court of the United States," or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding." 28 U.S.C. § 2254(d).

Although Young acknowledged in his appellate brief that the state court's rulings on both of his substantive due process claims are subject to AEDPA's deferential standard of review, he claimed for the first time at oral argument that his categorical claim should be reviewed de novo because the court addressed it only under state law. Delayed arguments such as these are ordinarily deemed to have been waived. See, e.g., Shell Co. (P.R.), Ltd. v. Los Frailles Serv. Station, Inc., 605 F.3d 10, 19 (1st Cir. 2010); United States v. Pizarro-Berrios, 448 F.3d 1, 5 (1st Cir. 2006); Piazza v. Aponte Roque, 909 F.2d 35, 37 (1st Cir. 1990). Young presents no persuasive argument as to why we should deviate from our established practice. Thus, we apply AEDPA's deferential standard of review to both of Young's claims.

## B.  Categorical Claim

Young first argues that a diagnosis of APD can never serve as a sufficient basis for civil commitment because the disorder does not affect volition and is so prevalent among criminal offenders that it cannot be used to distinguish ordinary recidivists from the dangerously mentally ill.  The Massachusetts Court of Appeals declined to adopt this argument in the abstract way in which Young presented it and instead disposed of the case by examining the evidentiary record to determine whether sufficient evidence was produced at trial to demonstrate that Young's APD seriously impairs his ability to control his sexual impulses. Young, 2006 WL 1042916, at *2.  We hold that the state court's analytical choice represents a reasonable application of Supreme Court precedent.

The Supreme Court has not decided whether a diagnosis of APD can qualify by itself as a sufficiently serious impairment to support the civil commitment of a dangerous individual.[2]  The Court's decisions in Hendricks and Crane, however, suggest that the

---

[2] In Foucha, the court invalidated the civil commitment of a person who had been diagnosed with APD in part because the statute under which the commitment was ordered did not require a finding of present mental illness.  504 U.S. at 78-79.  As other courts have noted, however, the court did not have to consider whether a diagnosis of APD can ever qualify as a sufficiently serious mental impairment to justify a civil commitment determination because the state stipulated that Foucha was not mentally ill.  See Brown v. Watters, 599 F.3d 602, 613 (7th Cir. 2010); Adams v. Bartow, 330 F.3d 957, 961 (7th Cir. 2003).

general issue as to whether a particular mental disorder can serve as a sufficient basis for civil commitment ordinarily is not susceptible to categorical analysis. In Hendricks, the court declined to give "talismanic significance" to the terminology used by the psychiatric community when evaluating the constitutionality of a state statute that based commitment on a finding of "mental abnormality" rather than "mental illness." 521 U.S. at 359. Instead, recognizing that civil commitment ultimately turns on law rather than psychiatry, the court gave state legislatures significant latitude in specifying the circumstances under which civil commitment will be warranted. Id. More recently, in Crane, the Court endorsed a contextual approach to the determination of whether an impairment results in serious difficulty in controlling behavior by stating that the determination should be made "in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself . . . ." 534 U.S. at 413. When read together, these decisions suggest that a diagnostic label such as APD, while relevant, will rarely be dispositive in determining whether an impairment is sufficiently substantial to seriously impair volition. Instead, it is the manner in which the condition "manifests itself in the individual" that will determine whether a particular commitment decision meets the requirements of the due process clause. Brown v. Watters, 599 F.3d 602, 614 (7th Cir. 2010). Because the state

-14-

court followed this approach, it did not unreasonably apply Supreme Court precedent when it refused to credit Young's categorical claim.

## C. __Contextual Claim__

Young alternatively challenges the jury's verdict by claiming that the record does not establish that APD causes him serious difficulty in controlling his sexual impulses.  He supports this argument by (1) noting that he was not found to have a paraphilia[3] such as exhibitionism or pedophilia in addition to APD and (2) citing excerpts from the cross-examinations of the three experts who testified for the Commonwealth, which arguably could be read to suggest that Young retains the capacity to control his sexual impulses in certain circumstances.  We hold that the Massachusetts Court of Appeals did not unreasonably apply Supreme Court precedent in rejecting this argument.

Like all questions of evidentiary sufficiency, this one must be analyzed on the basis of the record.  Although Young claims that APD cannot affect volition when it is unaccompanied by paraphilia, he fails to identify any evidence in the record to support this assertion.  Instead, he cites United States v.

---

[3] The DSM-IV lists several types of paraphilias and explains that "the essential features of a [p]araphilia are recurrent, intense sexually arousing fantasies, sexual urges, or behaviors generally involving 1) nonhuman objects, 2) the suffering or humiliation of oneself or one's partner, or 3) children or other non[-]consenting persons that occur over a period of at least 6 months . . . ."  DSM-IV at 566.

-15-

Wilkinson, 646 F. Supp. 2d 194, 205 (D. Mass. 2009), which recognizes that the psychiatric community is divided on the subject. See also Brown, 599 F.3d at 613 & n.13 (describing the debate concerning whether APD is an appropriate predicate for civil commitment). Even if it were appropriate to consider judicial decisions recognizing the current controversy in examining the state court's sufficiency determination — an issue we need not decide — these cases at most suggest that experts disagree, and such reasonable disagreements simply are not dispositive. Id. at 613-14. What matters here is that all three of the experts who testified in this case were in agreement that Young's APD causes him serious difficulty in controlling his sexual impulses.

Young's effort to cast doubt on the experts' opinions by pointing to selected excerpts drawn from their cross-examinations is also unpersuasive. As the record demonstrates, Young's impulse control problems date back to childhood and have continued throughout his incarceration. His two sexual offense convictions, as well as the evidence that he placed obscene phone calls from prison and possessed sexually explicit contraband while he was awaiting trial in the current matter, also provide substantial support for the experts' opinions that Young continues to experience substantial difficulty in controlling his sexual impulses. Although the record could be read to suggest that Young is able to control those impulses in certain circumstances, the

Supreme Court has held that a total lack of volitional control is not required to justify the commitment of a dangerous sex offender. <u>Crane</u>, 534 U.S. at 411, 413. Accordingly, the state court did not unreasonably apply Supreme Court precedent when it determined that Young suffered from a sufficiently serious mental impairment to warrant his civil commitment.

### III.

The district court's decision denying Young's petition for habeas corpus is affirmed.